Stanley E. WOODS, # 128876; Jamel Kabir (I'Man), # 142670; Kush Abdul B Ali Abu Abbass (A/K/A Charles James Lee), # 140852; Yusuf Abdur Rahman, # 132820; and John Brinson, # 161601, Plaintiffs,

v.

Commissioner Parker EVATT; Warden Benjamin Montgomery; Deputy Warden Bernard Walker; Chaplain George P. Windley; and the South Carolina Department of Corrections, Defendants.

Civ. A. No. 3:94–1071–3BC.

United States District Court,
D. South Carolina,
Columbia Division.

Jan. 24, 1995.

Stanley E. Woods, pro se.

Jamel (I'Man) Kabir, pro se.

Kush Abdul B Ali Abu Abbass, pro se.

Yusuf Abdur Rahman, pro se.

John Brinson, pro se.

Marvin Coleman Jones, Bogoslow & Jones, Walterboro, SC, for Parker Evatt, Benjamin Montgomery, Bernard Walker, George P. Windley and South Carolina Dept. of Corrections.

## ORDER

GEORGE ROSS ANDERSON, Jr., District Judge.

The five plaintiffs in this action are all inmates who were, at the time the suit was filed, incarcerated at the Allendale Correctional Institution (ACI), a part of the South Carolina Department of Corrections (SCDC). Plaintiffs alleged in their complaint that they were the victims of discrimination based on their religious beliefs. All five of the plaintiffs are practicing Muslims. In their complaint, which was filed April 20, 1994, the plaintiffs asserted that they had been deprived of their Constitutional rights in violation of 42 U.S.C. § 1983 by the defendants, employees of SCDC. Plaintiffs indicated that they had been deprived of rights guaranteed by the First, Eighth, and Fourteenth Amendments to the United States Constitution.

After the institution of this action, the parties engaged in an exchange of discovery, motions, requests, and other pleadings which are reflected in the file. On September 9, 1994, the Honorable Joseph R. McCrorey, United States Magistrate Judge, issued an Order and Recommendation addressing a number of the motions filed by both parties. Prior to that order and recommendation, plaintiff had filed a motion for summary judgment. On December 9, 1994, defendants filed a cross motion for summary judgment. After consideration of all of the record, including the Magistrate Judge's Order and Recommendation and the cross motions for summary judgment, the Court finds it appropriate to consider all of these issues in this order. Inasmuch as the disposition of the cross motions for summary judgment would potentially moot the other motions filed by the parties, the Court turns to those motions first.

### DISCUSSION

 The First Amendment of the United States Constitution states:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

The first portion of the amendment is divided into two separate clauses, generally referred to as the "Establishment Clause" and the "Free Exercise Clause." Both courts and commentators frequently refer to a natural tension between the two clauses because of the government's need to walk a fine line of neutrality. In theory, the government may neither aid nor hinder the practice of a particular religion. Government neutrality is violated equally by either government approval *or* disapproval of a religion. *Vernon v. City of Los Angeles*, 27 F.3d 1385, 1396 (9th Cir.1994). Further, "the First Amendment forbids an official purpose to disapprove of a particular religion or of religion in general." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, — U.S. —, —, 113 S.Ct. 2217, 2226, 124 L.Ed.2d 472 (1993). In a concurring opinion in that case, however, Justice Souter noted that in practice, however, some government regulation necessarily hinders the practice of religion, while other government practices must necessarily aid the religion. *Id.*

Plaintiffs in this case allege that SCDC and these defendants in particular have run afoul of both clauses of the First Amendment. In general terms, plaintiffs have alleged that SCDC promotes the establishment of the Christian religion by providing more opportunities and better facilities to the Christian faith groups. Likewise, they maintain that their free exercise of religion is impeded by the defendants, who have refused to make similar accommodations for their religious practices as are provided for the Christian faith groups. In their motion for summary judgment, the defendants have noted that the plaintiffs have stated four causes of action, each against one of the named defendants, excluding SCDC.

**A. Legal standards under 42 U.S.C. § 1983 and the Religious Freedom Restoration Act of 1993 (42 U.S.C. § 2000bb).**

Under the clear language of § 1983, a person seeking to state a claim under that

statute must show that he or she was deprived of a right guaranteed by the Constitution of the United States by a person acting under color of state law. In this case, the constitutional rights at issue are the plaintiffs' rights to follow their religion. No doubt exists that the defendants are "persons," at least in their individual capacities, and that these persons, as employees within SCDC, are acting under color of state law. The issue then becomes whether the restrictions and inconveniences placed on the plaintiffs rise to the level of a deprivation of their constitutional right to practice their religion.

Just as there is a natural tension between the two clauses of the First Amendment, there is a natural tension between the freedom to practice religion by a person who is incarcerated and the legitimate administrative and security concerns of the prison system. As noted in the Magistrate Judge's Report, the United States Supreme Court has stated:

> But given a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution.
>
> * * * * * *
>
> Our cases hold that the convicted felon does not forfeit all constitutional protections by reason of his conviction and confinement in prison. He retains a variety of important rights that the courts must be alert to protect (cite omitted). *Meachum v. Fano,* 427 U.S. 215, 224–225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976) (emphasis in original).

The Supreme Court has frequently and repeatedly refused to intervene in routine administrative decisions by prison officials, noting that the states have an interest in maintaining security and discipline within their prison systems and that the courts have neither the desire nor the expertise to administer state prisons. *See generally, Hudson v. Palmer,* 468 U.S. 517, 523, 104 S.Ct. 3194, 3198, 82 L.Ed.2d 393 (1984) and *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). In more recent cases, the Supreme Court has stated that prisoners maintain the right to follow their religion, so long as their religious practices could be reasonably accommodated by prison officials; however, when those practices conflicted with security concerns, the "legitimate penalogical objectives" should control. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987).

Slightly more than one year ago, however, the United States Congress passed the Religious Freedom Restoration Act (RFRA), effective November 16, 1993. *See* 42 U.S.C. § 2000bb *et seq.* In its declaration of purposes, the statute states that even a law which is apparently "neutral" toward religion may place inappropriate burdens on that person's exercise of religion. 42 U.S.C. § 2000bb(a)(2). The statute itself states: "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b)." Subsection (b) states "[g]overnment may substantially burden his exercise of religion only if it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." The law also specifically declared that the act was not intended to affect the Establishment Clause of the First Amendment. 42 U.S.C. § 2000bb–4. In addition, although Congress considered exempting prison systems from the requirements of the Act, the exemption was not adopted, leaving the clear inference that the prison systems are within the reach of the Religious Freedom Restoration Act.[1]

---

1. Interestingly, however, on October 6, 1994, Congress adopted Public Law 103–344 as an amendment to the American Indian Religious Freedom Act. This new law specifically allows American Indians peyote cactus during traditional ceremonial religious sacraments. The law allows the regulation and registration by various federal and state agencies of persons or entities who cultivate and distribute the substance, but specifically refused to require prison authorities to allow access to the substance by Indians for religious purposes during their incarceration. *See* Subsection b(5).

As already described, the RFRA has three components. A person seeking to state a claim under this section must show that the government has substantially burdened a person's exercise of religion. Once the plaintiffs make this showing, the government then has the duty to show that the burden was placed on that person's exercise of religion "in furtherance of a compelling governmental interest" and that there was no less restrictive means to further that governmental interest. 42 U.S.C. § 2000bb–1. There is no question in this case that the defendants were acting as an arm of the government, thus bringing them within the ambit of this statute. Plaintiffs must show, however, that the claims they have stated in their complaint placed a "substantial burden" on their exercise of religion.

A "substantial burden" has been defined thusly: "where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists." *Thomas v. Review Board, Indiana Employment Security Division,* 450 U.S. 707, 717–18, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981). Further, however, the burden placed on the religious exercise "must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief which is central to religious doctrine." *Graham v. C.I.R.,* 822 F.2d 844, 851 (9th Cir.1987), *aff'd. sub nom., Hernandez v. Commissioner,* 490 U.S. 680, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989). The burden must be more than mere inconvenience or a less desirable situation. *See Prins v. Coughlin,* 94 Civ. 2053, 1994 WL 411016, 1994 U.S.Dist. LEXIS 10564 (S.D.N.Y., August 3, 1994) (plaintiffs' transfer for security reasons resulted in less desirable kosher diet.). Stated differently, the practice places a substantial burden on the religious exercises of inmates if it coerces them into violating their religious beliefs, or if it compels them to refrain, "by threat of sanctions, to refrain from religiously motivated conduct." *See Brown–El v. Harris,* 26 F.3d 68 (8th Cir.1994), citing *United States v.*

*Means,* 858 F.2d 404, 407 (8th Cir.1988), *cert. denied,* 492 U.S. 910, 109 S.Ct. 3227, 106 L.Ed.2d 575 (1989).

Plaintiffs filed a motion to amend their complaint to allege a cause of action under the RFRA which was granted by the Magistrate Judge. Notably, the RFRA is *both* a new cause of action and a revised standard of review for claims brought under other statutes, such as § 1983, where the claims involve a denial of constitutionally guaranteed religious freedom.

### B. Claims alleged by plaintiffs

Although plaintiffs' claims were outlined in more than a hundred paragraphs of the complaint, those claims can be condensed into ten general allegations.

1. Plaintiffs are not allowed to use the visitation room for their weekly worship service, as the Christians are allowed to do. This prevents plaintiffs' family and friends from being allowed to worship with plaintiffs, as is allowed for the Christians (Complaint, pages 14–20, 27, and 28).

2. The weekly Muslim service is not open to the general inmate population, as is the Christian service (pages 27 and 28).

3. Muslims are not allowed to leave their assigned jobs to attend this weekly service on Friday afternoons (pages 79 and 80).

4. Plaintiffs at ACI are not provided with a Muslim chaplain (pages 10–13).

5. The Muslims are not provided worship facilities, equipment, materials, or opportunities equal to those provided to the Christians (pages 11–13, 22–24, 25, 26, and 37).

6. Defendant SCDC has failed to obtain and provide religious materials to the Muslims; when materials are provided, they are given only to the registered Muslim inmates and are not made available to the general population (pages 22–24).

7. Plaintiffs have been denied the use of incense, oil, and prayer rugs (paragraphs 62, 63, and 77).

8. Muslim inmates in administrative segregation are denied access to the weekly service and to other religious opportunities, such as study groups (pages 66–76).

9. Plaintiffs are not allowed to receive gifts during their primary religious holidays. The only times when gifts can be received by the inmate population is the month of December. Because this coincides with the Christian religious season, the Muslims would be offended by receiving gifts during this time (pages 56–61).

10. The Muslim inmates are not allowed unrestricted opportunities for fund-raising activities (pages 30–32).

Review of the plaintiffs' complaint clearly shows that they have failed to state a cause of action under either § 1983 or under the RFRA, primarily because they have not shown that any of the actions by the defendants interfered with (or "substantially burdened") their practice of religion. A review of plaintiffs' allegations further shows that the alleged deprivations are more fairly characterized as a refusal by the defendants to aid the plaintiffs in their religious activities and that their refusal resulted from an appropriate balancing of the two clauses of the First Amendment.

In general terms, the defendants have provided a great deal of information about their attempts to meet the needs of the Muslim inmates at ACI and what they believe are appropriate reasons for their decisions. Defendants outlined their understanding of the fundamental tenets of the Muslim religion, summarizing the five pillars of the Islamic faith, which include the commitment to Allah, the ritual of prayer five times daily, the Friday worship service, two yearly religious holidays, charity to the poor, fasting during Ramadan, and the pilgrimage to Mecca.[2]

The defendants admit that they do not allow the pilgrimage to Mecca, nor do they have they any involvement in the initial commitment to Allah. They have asserted, however, that they allow the plaintiffs to pray five times each day, they provide a time and place for the weekly worship service, and they allow the SCDC Muslim inmates to hold statewide meetings for purposes of worshipping together during their two major religious holidays. To that end, yearly planning sessions are held with inmate representatives from each prison and all of the Muslim inmates are transported to one institution for observance of that religious celebration. See Windley Aff. ¶¶ 19–22. Defendants have also stated in affidavits that they accommodate the inmates' need to fast during the daylight hours of Ramadan and provide breakfast before dawn and dinner after dark during that period of time. See Windley, Aff. ¶ 18.[3]

In his affidavit, Omar Shaheed states that he is a follower of the Islamic faith, he is a full-time chaplain employed by SCDC and oversees the activities of five part-time Muslim chaplains employed by SCDC. He further states in paragraph 10 of this affidavit that he has reviewed the plaintiffs' complaints and based on his belief both as a follower of Islam and a holder of a Master in Divinity Degree, that even if these complaints are taken as true, they do not affect the plaintiffs' ability to practice their faith as Muslims. Further, "none addresses deprivations of the fundamental tenants [sic] of the Islamic faith."

In response to the defendants' motion for summary judgment, the plaintiffs filed a pleading in which they reiterated the allegations of their complaint and argued that these allegations would state a claim under either the test enunciated in *O'Lone v. Estate of Shabazz, supra,* or under the recently enacted RFRA. The plaintiffs have not contradicted the defendants' statements about the Islamic faith or their analysis of the fundamental tenets of the faith.

### 1. Plaintiffs' Friday afternoon worship service

■ A large number of the allegations included in the complaint involve plaintiffs' claims that they are discriminated against in the assignment of space and other privileges. Several of their complaints center on the fact that they are assigned space in the multipur-

---

**2.** The five fundamental tenets listed and described by the defendants are the same as those listed in the affidavit of Rodney Davis, attached as an exhibit to his motion to intervene filed on August 10, 1994.

**3.** Defendants did not discuss how they facilitate the inmates' participation in the charitable acts prescribed by the Quran.

pose building at ACI for their weekly congregational prayer service, the Ju'mah. They would prefer to hold this service in the visitation room where outside visitors could attend the service. They contend that the Christians' worship service is held on Sunday mornings in the visitation room with family allowed to attend; therefore, plaintiffs believe they should be afforded an equal opportunity to worship with their families. They further contend that the multipurpose building is also used as a gymnasium so that it is hot, uncomfortable and reeks of sweat. Further, they assert that inmates who are not registered as Muslims are not allowed to leave assigned work stations to attend this service.

The defendants have advanced two rationales for this assignment of space. First, they note that the Ju'mah services must be held on Friday afternoons, and that only two rooms at ACI are large enough to accommodate the service. Those rooms are the visitation room and the multi-purpose building. If the visitation room was used, the service would prevent visitation on Friday afternoons for approximately 90% of the prison population at ACI, potentially resulting in tension and conflict between the Muslim and non-Muslim inmates. In contrast, the Christian service is held from 8–9 a.m. on Sunday morning, a time which does not interfere with visitation. They further deny that the building is smelly, stating that it is cleaned twice each day. *See* Walker affidavit, ¶ 6, filed August 26, 1994, with defendants' response to plaintiffs' motion to amend.

A review of all the pleadings filed by both parties clearly shows that the use of the visitation room by the Islamic inmates for Ju'mah services would preclude its use by the great majority of inmates at ACI for visitation purposes during the same period of time. Since the Ju'mah services must be held on Friday afternoons and the multipur-

pose building was the only other building at the institution large enough to accommodate the Islamic religious service, the decision to assign the Islamic inmates to the multipurpose building was not motivated by any intent to discriminate on the basis of religion, does not substantially burden Plaintiffs' practice of their religion, and is neutral as to the First Amendment.

■ The requirement that the Ju'mah service be held on Friday afternoon also accounts for the claim that inmates not registered as Muslims cannot attend the service. Since the service is held at a time which, for any person not a Muslim, is a part of the work week, an inmate would normally be required to be at his assigned work station at that time. Only those inmates who are registered as Muslims would be allowed to leave their work stations to attend services. Since all of the plaintiffs are apparently registered as Muslims, they would be allowed to attend the service.[4] Any inmate not registered has the option of registering; if he seeks only to participate as a matter of interest, he has the alternative of attending the Muslim study group until such time as he decides he wishes to register as a Muslim.

The need to register is not a substantial burden on the inmates' rights to practice their religion. Since the timing of many of the Muslim events is different from that of other religious faith groups, registration of the inmates' religious preferences allows the prison officials to know which inmates are entitled to the special accommodations which are made for the Muslim inmates. These accommodations range from allowing the inmates to leave their work stations to attend Ju'mah services, provision of a pork-free diet, provision of meals during non-daylight hours during Ramadan, and transportation to the yearly Muslim festivals, which are held on a statewide basis within the Department of Corrections.[5] Obviously, without some indi-

---

4. Although plaintiffs have also alleged that they are *not* allowed to leave their assigned work stations to attend service, they have provided no facts in support of this contention. Despite the voluminous pleadings they have filed, no person has stated that he is registered as a Muslim, that he requested permission to attend the weekly worship service and was denied that permission.

5. Many of these accommodations are in excess of those granted to other religious faith groups. For example, no other group is allowed to hold state-wide religious festivals.

cation of the number of inmates entitled to these privileges, institutional authorities would be unable to determine how many meals to prepare or how many inmates needed transportation. The registration of the inmates does not pose a burden on their exercise of religion and, in fact, is used to provide special accommodations for their exercise of religion, but is neutral as to the First Amendment.

### 2. Failure to provide a Muslim chaplain

██ One claim which presents apparent cause for concern under both § 1983 and under the RFRA is plaintiffs' allegation that there is no chaplain at ACI to oversee the Muslim study groups or worship services or to act as a sponsor for their group activities. The defendants admitted that there was no full-time chaplain assigned to ACI. In an affidavit, Omar Shaheed indicates that he is the only full-time Muslim chaplain statewide.[6] He also stated, however, that SCDC had six part-time chaplain positions, five of which were filled. He further indicated that the chaplain assigned to ACI through September 1994, Thabit Majeed, had also been assigned to Lieber and McDougal Institutions and had determined that he was unable to serve all three of those facilities. For that reason, the sixth position, when filled, would be divided between ACI and Evans Institution. See Aff. ¶¶ 6, 9. Shaheed indicated that he was attempting to fill this sixth position and, in the interim, he was visiting ACI until a solution was found. Shaheed Aff. ¶ 9. Chaplain Windley indicated in his affidavit that two inmates, Michael Bailey and Heyward Harrison, had been approved to visit Muslim inmates in administrative segregation to provide appropriate worship opportunities. See Aff. ¶ 20. The defendants' pleadings show that they are attempting to provide spiritual guidance to the Muslim inmates at ACI and that the lack of a part-time chaplain at that institution is a temporary situation, not a deliberate attempt either to discriminate against the Muslim population at ACI or to interfere in their religious freedom; it does

not pose a substantial burden and is neutral as to the First Amendment.

### 3. Differing levels of support

██ Many of the allegations of the complaint state that the defendants provide much more support to the Christian inmate population by way of worship services, educational programming, and facilities. See Complaint, ¶¶ 11, 13, 21–27, 37, 46–52 and 66. The defendants have responded, however, that much of the treatment which the plaintiffs perceive to be disparate or preferential is, in fact, provided from outside groups and sources. For example, documents filed by the plaintiffs on August 12, 1994, included a list of events for August 1994. The first page included 14 special events scheduled for that month. Of the 14 events, Chaplain Windley (the institutional chaplain at ACI) is mentioned only three times. Two of those times involve events occurring outside the institution. The remaining 11 events include a variety of worship services, all involving ministers or groups from outside the institution.

In plaintiffs' arguments on this subject, they claim that the Muslims are the majority faith group within SCDC and particularly at Allendale Correctional Institution. That claim is contradicted by the affidavits filed with the defendants' motion for summary judgment. For example, in the affidavit of Omar Shaheed, the Senior Muslim Chaplain for SCDC, he states that the statewide Muslim prison population is approximately 500 inmates, versus an entire prison population of approximately 17,000. See, Affidavit, ¶¶ 12 and 15. In an affidavit by the Deputy Warden at ACI, Bernard Walker indicates that the entire prison population at ACI numbers 1,080 inmates. Of those, 450 are identified as Christians and 88 are identified as Muslims. These numbers directly contradict plaintiffs' claims that the Muslims are the majority group at ACI. See Complaint, ¶¶ 10, 15–20 and 38. Plaintiffs' only response

---

6. SCDC apparently employs chaplains, at state expense, to serve the religious needs of the inmate population.

has been the continued assertion that they comprise the "majority" religious group.

Similarly, the Muslim population in South Carolina is much smaller than that of the Christian population. For this reason, the chaplains at SCDC have difficulty finding outside persons and sources to minister to the Muslim population within the prison system. Chaplain Windley further avers that since his arrival at ACI in 1989, he has written to over 30 Islamic publishers requesting the donation of religious materials for use by the prison inmates. When materials were received from the Islamic publishers, he distributed those materials to the inmates. Both of the affidavits signed by these chaplains indicate that although the plaintiffs complain they are not given the same level of aid as Christian faith groups (Complaint ¶'s 46–52, 62 and 66), any disparity results not from the actions of the defendants, but from the different levels of volunteer activities in the prison by outside persons and groups.[7]

The differing numbers of the religious faith groups found in the prison population account for additional disparities in the allocation of resources. Plaintiffs have alleged that they were denied study space, for a requested two evenings a week, while the Christian faith groups have group teachings approximately twenty times per month. However, documents provided by the plaintiffs indicate that plaintiffs do have a study group meeting of some sort every Tuesday evening or four times per month. Defendants have shown that the Christian community at the prison is approximately five times larger than that of the Islamic community, so the different allocation of space for inmate activities is understandable. Further, there is no "constitutional obligation to equally allocate resources among all religious groups." *Vernon v. City of Los Angeles*, 27 F.3d 1385 (9th Cir.1994), citing *Butler–Bey v. Frey*, 811 F.2d 449, 453–54 (8th Cir.1987). Not every "religious sect or group within a prison—

however few in number—must have identical facilities or personnel." *Cruz v. Beto*, 405 U.S. 319, 322, n. 2, 92 S.Ct. 1079, 1082, n. 2, 31 L.Ed.2d 263 (1972). There is no substantial burden and the practice is neutral as to the First Amendment.

### 4. More restrictive conditions

Many of the plaintiffs' allegations are simply unsupported by facts of any sort in their pleadings. *See generally,* paragraphs 24, 27, 28, 37, 38–45, 62, 79–83. In all of these paragraphs, the plaintiffs contend that conditions are generally more restrictive as to the Islamic inmates than other faith groups, arguing that Christian materials are made available to the entire inmate population at ACI, while Islamic materials are distributed only to registered Muslims. Although the defendants do not specifically address this contention, explanation is found in the affidavit of George Windley filed with the defendants' motion for summary judgment. As he notes, the small number of Muslims in the outside communities in South Carolina results in a much smaller amount of donated material for use within the prison system.[8] He also indicates that when he received materials from Islamic publishers, he distributed those materials to the Muslim inmates. Aff. ¶ 10.

Plaintiffs also complain that they may receive religious materials only if they are forwarded directly from the publisher. They apparently see this as an attempt to limit their access to religious materials. Defendants have shown that all inmates are subject to the same restrictions. In an effort to prevent the transmission of contraband, inmates can receive hard bound books and/or magazines only when forwarded directly from the publisher. *See* Aff. of George Windley, ¶ 17. There is no substantial burden, and the practice is neutral as to the First Amendment.

---

7. Plaintiffs have also argued that these materials should have been made available to non-Muslim inmates, as well as the registered Muslims, but Chaplain Windley's affidavit implies that the number of materials were insufficient even for the registered Muslims.

8. *See also* Affidavit of Terry Brooks, ¶ 11, attached to defendants' response to plaintiff's motion to amend, filed August 26, 1994.

### 5. Denial of religious aids

 In other paragraphs of their complaint, the plaintiffs have alleged that they are denied the use of oil, incense, and prayer rugs during their religious services, but again, they have failed to provide facts to support these allegations. Defendants have stated that plaintiffs have failed to fulfill the necessary requirements of SCDC policy for the use of those substances. In their complaint at paragraph 62, plaintiffs admit that the SCDC policy provides that Muslims may purchase oil from the canteen and that while they may not possess incense, that substance can be mailed or delivered to the institutional chaplain for use at their Ju'mah service.[9] Plaintiffs follow this admission with a statement in paragraph 62 that they are denied the use of incense, but they further state, "Defendants have not even suggested to the Plaintiffs, that they will be the slightest of a Good Samaritan." There is no substantial burden here, nor violation of First Amendment neutrality. Moreover, since plaintiffs do not suggest any where in their pleadings that incense is mailed to the institution for their use, but not passed on by institutional authorities, the reading of these two paragraphs in conjunction suggest that they believe the institution should provide incense for use at their religious service. This "aid" to religion would be in violation of the Establishment Clause of the First Amendment.[10]

### 6. Inmates in administrative segregation

 Although the plaintiffs have described in general terms a number of alleged deprivations of their constitutional rights, they have failed to support these claims with facts showing how the alleged deprivations occurred, that the alleged deprivations bur-

dened their practice of religion, or that the alleged deprivations were against any of the named plaintiffs in this action. For example, the plaintiffs claim that inmates in administrative segregation are not allowed to attend worship services, nor are they given weekly worship services as dictated by SCDC Policy No. 2100.9–5. Plaintiffs also generally attack the fact that members of the Islamic community are confined in administrative segregation, stating that the conditions and practices of the segregation unit are offensive to their religion.[11] *See generally*, Complaint ¶ 66–77, 79–83.

The complaint in the instant action contained no evidence or information that any of the five named plaintiffs were confined in administrative segregation or that they were under the threat of such a confinement. On June 8, 1994, however, plaintiffs filed a motion for a restraining order, which showed that three of the plaintiffs were confined in administrative segregation following their participation in a work stoppage at ACI. Although these plaintiffs contended that this action was taken as retaliation for bringing the instant lawsuit, documents filed by the plaintiffs show that the inmates were charged with a violation of institutional rules because they encouraged other inmates to participate in a protest and work stoppage, resulting in nearly half of the cafeteria workers refusing to work. *See* Incident Report attached as an exhibit to plaintiffs' memorandum in support of summary judgment filed August 10, 1994. Further, the filing date of the instant lawsuit was April 20, 1994, three days after the alleged incident for which the inmates were locked up. There is no apparent explanation why prison officials would have been aware of this lawsuit, since the

---

9. These items are not generally allowed in prisoners' cells at ACI. For example, incense is prohibited because it could be used to mask the odor of other burning substances.

10. Plaintiffs have also argued that the canteen at ACI sells Christmas tree-shaped and scented room fresheners, which some inmates burn as an incense in their rooms. They find these room fresheners offensive, since plaintiffs believe they are an indication that defendants sanction the Christian religion, since their Christmas-tree shape links them to a Christian religious holiday.

Plaintiffs' motion for summary judgment, page 25. They do not suggest, however, that the burning of these room fresheners is authorized or condoned by the institutional authorities.

11. To the extent plaintiffs may be attacking the use of administrative segregation by the prison system, it has been held that "Administrative segregation is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration." *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983).

incident in question occurred three days prior to its filing, and plaintiffs have made no showing of such knowledge by the officials.

■ As to plaintiffs' general claims that inmates in administrative segregation are denied an opportunity to worship, the defendants have indicated that none of the inmates in administrative segregation are allowed out for religious services, whether Christian or Muslim. Those inmates receive the opportunity to worship when other persons visit them in their cells, such as outside ministers or inmate advisors approved by prison officials. The plaintiffs have not countered these declarations. Any denial of an opportunity to worship is related to the inmate's placement in administrative segregation, independent of his religion. There is no substantial burden nor violation of the neutrality required by the First Amendment.

### 7. Gift giving

■ Another group of the plaintiffs' allegations reveals the potential for an administrative nightmare within the prison system. They contend that the Christian faith groups are favored because they are allowed to receive food visits "on Memorial Day, Thanksgiving and Christmas, along with gifts and presents during the month of December." They argue that it is abhorrent to their religious principles to receive gifts during the Christmas season and wish to be allowed to receive gifts during their primary holidays which occur at the end of Ramadan and approximately ten weeks later. In essence, plaintiffs seek an additional privilege which, although related to their religious beliefs, is not central to the practice of those beliefs. Further, if the prison system granted their requests, SCDC would be constrained to allow Islamic inmates to receive presents two or three times per year, a privilege far beyond that enjoyed by other faith groups. Alternatively, SCDC could allow the receipt of presents to the Islamic population only during their feast days but deny them receipt of presents during the month of December. This alternative, however, would result in a bureaucratic nightmare in attempting to determine which inmates could receive presents at each time. Since inmates in general have no constitutional right to receive gifts at any time of the year, plaintiffs have failed to show the deprivation of a constitutional right with these claims. Further, plaintiffs have made no claim that the exchange of gifts during their religious season is central to their religious beliefs; therefore, the policy does not place a substantial burden on the practice of their religion and is neutral as to the First Amendment.

### 8. Fundraising

■ Several of the plaintiffs' claims are also barred because plaintiffs have failed to show that they took the necessary, reasonable steps to comply with institutional regulations. Specifically, the inmates contend that they are not allowed to organize fund raising activities, but they admit institutional rules prohibit fund-raising activities by faith groups (Complaint, ¶ 29.). Plaintiffs further state, "A Faith group may organize an Institutional Club" in order to conduct fund raising projects. They do not allege that they have attempted to organize such an institutional club and were denied permission, or that they organized such a club and were denied permission to participate in fund raising activities. They state simply that they submitted a proposal for a fund raising project and were denied permission. *See* Complaint, ¶ 32. In their answer, the defendants denied the allegations of paragraph 32 and stated, "Only approved organizations can submit proposals for fund raising." Answer, ¶ 28. The defendants further stated in paragraph 36 of their answer, "the defendants admit that this group has failed to comply with inmate organization policy 1500.48 SCDC Policy."

In a similar case to this one, inmates were held not to have made a threshold showing that they were subjected to a substantial burden, because the defendants enforced all of the prison rules uniformly, and the inmate group had never applied to prison authorities for recognition. *Boone v. Commissioner of Prison,* No. 93–5074, 1994 WL 383590, 1994 U.S.Dist. LEXIS 10027 (E.D.Pa.1994). In this case, the plaintiffs have repeatedly alleged restrictions against them which are not enforced against other faith groups, but they

have provided no information as to how those restrictions hinder their practice of religion. Nor have plaintiffs provided facts to support their claims that the restrictions are not uniformly enforced.

## C. No "substantial burden"

After review of the plaintiffs' complaint, it appears that few of defendants' actions they allege places *any* burden on their exercise of religious beliefs. The defendants set forth their understanding of the Islamic faith and their attempts to fulfill the basic needs for the inmates exercise of religion. As indicated in the preceding discussion, the location of the Muslim worship service is dictated by the conflict between normal visiting hours and the necessary timing of that worship service on Friday afternoons. The denial of the fund raising projects has resulted from plaintiffs' failure to qualify themselves as an institutional club which could participate in fund raising activities. Plaintiffs assert that they are denied funds from SCDC for various religious purposes; Chaplain Windley's affidavit indicates that they are the *only* inmate group to have received religious materials purchased by state funds.[12] The differing levels of volunteer efforts by the outside Christian community and the outside Muslim community accounts for the discrepancy in visitation and programming. All inmates are required to obtain books and other reading material directly from the publisher to avoid the use of these materials to transmit contraband.

In response, however, the inmates only provided generalized statements that the de-

fendants discriminated against the Islamic population at ACI. They did not provide specific instances where they were denied the opportunity to participate in the fundamental precepts of their faith.[13] Even after the defendants produced evidence to contradict many of the plaintiffs' claims, the plaintiffs continued to insist that their version of the situation was correct.[14] Further, many of the items sought by plaintiffs for personal use, such as oil, incense and prayer rugs, were apparently made available for their use during the weekly worship service, but not for use within the cells. The plaintiffs have not shown that the burdens they experience due to their incarceration are anything more than an inconvenience,[15] and certainly not a substantial burden or First Amendment violation.

## D. Defendants' "compelling interest"

Even if the plaintiffs had been able to show that their exercise of religion had been substantially burdened by the defendants, the defendants have shown both a compelling governmental interest and that they have addressed that interest in the least restrictive manner. Although Congress considered limiting the reach of the RFRA to exclude prisons, the amendment was defeated. Cong.Rec. S14468 (October 26, 1993). The Senate recognized, however, that the interests of the States in the orderly and secure administration of their prison systems was a "compelling governmental interest." S.Rep. No. 103–111, 103rd Cong., 1st Sess. 9 (1993). The Senate's recognition of this compelling interest was consistent with general case law of the United States Supreme Court. *See*

12. *See also* Affidavit of Terry Brooks, ¶ 11, attached to defendants' response to plaintiff's motion to amend, filed August 26, 1994.

13. Although plaintiffs alleged in their motion for summary judgment that prison officials refuse to recognize and use their legally-changed Muslim names, none of the plaintiffs in this action has allegedly had this problem.

14. These include claims that the plaintiffs were the majority faith group, after defendants showed they were vastly in the minority; plaintiffs' claim that there was no Muslim chaplain statewide, in light of Shaheed's affidavit stating that he was a full-time chaplain and supervised five part-time chaplains; and plaintiffs' claim that no one was

allowed to minister to Muslim inmates in segregation, despite the mention of two inmates named by defendants as authorized to minister to those inmates.

15. In a case with very similar facts to those presented by these plaintiffs, inmates argued that they were not given similar amounts of time, accommodations, or provisions for worship as other religious groups. *See Rust v. Clarke*, 851 F.Supp. 377 (D.Neb.1994). The court in that case granted summary judgment as to many of the plaintiffs' claims and as to monetary damages. Full summary judgment was denied only because the defendants had failed to address the inmates' claims under the newly-enacted RFRA.

*Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

When reviewing the plaintiffs' complaints, it appears that most of their allegations are actually arguing that the defendants fail to aid the worship of the Islamic community. Generally, plaintiffs contend that SCDC should be providing more items such as educational materials, religious treatises, incense and oil, prayer rugs, etc., than they currently provide for these inmates. As indicated in the preceding discussion, however, furnishing this type of aid to a specific religion would be in violation of the establishment clause of the First Amendment. That amendment is satisfied if the defendants, including SCDC, simply raise no barriers to the use of these items by the inmates.

### E. Defenses Asserted by Defendants

Defendants have asserted a number of defenses to the allegations of plaintiffs' complaint, including Eleventh Amendment immunity, qualified immunity and that they are not liable under the doctrine of *respondeat superior.* All of the defendants have been sued in both their official and individual capacities. As they contend, they are all absolutely immune from a suit for monetary damages in their official capacities.

The clear language of § 1983 requires that a "person" may be sued by another where a deprivation of constitutional rights can be shown. In the case of *Will v. Michigan Department of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), the Supreme Court analyzed the interplay between § 1983 and the Eleventh Amendment of the Constitution. Because the Eleventh Amendment provides an absolute immunity for the states against all suits, the "person" referred to in § 1983 cannot include a state or any divisions of the state.[16]

> Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties. The Eleventh Amendment bars such suits unless the State has waived its immunity [cites omitted] or unless Congress has exercised its undoubted power under § 5 of the Fourteenth Amendment to override that immunity.

When § 1983 was passed as part of the Civil Rights Act of 1871, Congress did not interject any language in the Act which would specifically override the immunity of the states provided by the Eleventh Amendment; therefore, there is no federal forum for civil rights claims against the various states.

■ The Eleventh Amendment immunity granted to the states "applies only to States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes," but the court found that state agencies, divisions, departments and officials are entitled to the Eleventh Amendment immunity. *Will, supra* at 70, 109 S.Ct. at 2312. In reaching this conclusion, the court held that a suit against state officials acting in their official capacities is actually against the office itself and, therefore, against the state. State officials may only be sued in their individual capacities if the plaintiffs are seeking monetary damages. The single exception is where a plaintiff is seeking injunctive relief. In that situation, the officials may be sued to enjoin an action.

■ The defendants have also stated that they are not liable under the doctrine of *respondeat superior* for any alleged infractions of plaintiffs' constitutional rights. Plaintiffs have failed to establish that they had any constitutional rights deprived by these defendants. However, under the doctrine of *respondeat superior,* an employer or supervisor is not liable for the acts of their employees, absent an official policy or custom which results in illegal action. See *Monell v. Department of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978) and *Fisher v. Washington Metro Area Transit Authority,* 690 F.2d 1133, 1142–43 (4th Cir.1982). The employer or supervisor may only be held liable if a plaintiff can show that they had actual knowledge of a specific deprivation, but were deliberately indifferent to the plaintiff's rights despite their knowl-

---

**16.** The immunity granted by the Eleventh Amendment may be abrogated by clear language in a statute, but such language was not contained in either § 1983 or in the RFRA.

edge, *Slakan v. Porter,* 737 F.2d 368 (4th Cir.1984). Plaintiffs have not shown that any SCDC policies deprived them of their constitutional rights or placed a substantial burden on their exercise of their religion, beyond the burden implicit in their prison confinement.

■ Last, the defendants contend that they may not be held liable both because they enjoy qualified immunity and because the Religious Freedom Restoration Act is not retroactive.[17] Under the terms of the RFRA, however, the "Act applies to all Federal and State law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after the enactment of this Act." 42 U.S.C. § 2000bb–3(a). Nearly every case which has considered the issue of retroactivity has held that the RFRA is retroactive. *See Brown–El v. Harris,* 26 F.3d 68, 69 (8th Cir.1994) (*dicta*); *Boone v. Commissioner of Prisons,* No. 93–5074, 1994 WL 383590, 1994 U.S.Dist. LEXIS 10027 (E.D.Pa. July 21, 1994); *Rust v. Clarke,* 851 F.Supp. 377, 380 (D.Neb.1994) (*dicta*); *Allah v. Menei,* 844 F.Supp. 1056, 1061 at n. 15 (E.D.Pa.1994); and *Lawson v. Dugger,* 844 F.Supp. 1538, 1542 (S.D.Fla.1994).

As the defendants contend, however, these courts have found that the RFRA is applicable retroactively, but most of those decisions were considering the issue of whether to grant injunctive relief and were not considering a award of monetary damages. As in this case, defendants sued in their official capacities would be immune from claims for monetary damages. If the RFRA is applied retroactively against these defendants in their individual capacities, they would be entitled to qualified immunity for any actions taken prior to the effective date of the legislation.

> The doctrine of qualified immunity attempts to reconcile two potentially conflicting principles: the need to deter government officials from violating an individual's federal civil rights and the need for government officials to act decisively without undue fear of judicial second guessing.

*Akers v. Caperton,* 998 F.2d 220, 225–226 (4th Cir.1993).

In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the United States Supreme Court established the standard which the court is to follow in determining whether defendant is protected by this immunity.

> Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow, supra,* at 818, 102 S.Ct. at 2738.

In its most recent discussion of qualified immunity, the Court of Appeals for the Fourth Circuit stated:

> Qualified immunity shields a governmental official from liability for civil monetary damages if the officer's 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' 'In determining whether the specific right allegedly violated was 'clearly established,' the proper focus is not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged.' Moreover, 'the manner in which this [clearly established] right applies to the actions of the official must also be apparent.' As such, if there is a 'legitimate question' as to whether an official's conduct constitutes a constitutional violation, the official is entitled to qualified immunity.

*Wiley v. Doory,* 14 F.3d 993 (4th Cir.1994).

The RFRA was clearly a change in the law and was a clear and determined break from the interpretation of that law by the Supreme Court and the appellate courts. As its legislative history makes clear, the law was intended to change the standard under which claims of religious freedoms and/or discrimination were considered. 42 U.S.C. § 2000bb(b)(1) stated that the law was intended "to restore the compelling interest

---

17. The only specific dates mentioned by the plaintiffs were before the effective date of the RFRA (November 16, 1993). The dates mentioned by the plaintiffs were August 3, 1993, and November 1, 1993, in paragraphs 32 and 38 of their complaint.

test" set forth in cases decided by the U.S. Supreme Court in 1963 and 1972. At the time of most of the actions taken in this case, the defendants were all acting under the former "standard" of *O'Lone v. Estate of Shabazz* and other related cases. Their conduct could not have violated "clearly established statutory or constitutional right" since the RFRA had not yet been passed. They would, therefore, be entitled to qualified immunity for any actions they took or decisions they made prior to the enactment of the RFRA. *See also Boone v. Commissioner of Prisons, supra.*[18]

## F. Standard for Summary Judgment

The Federal Rules of Civil Procedure encourage the entry of summary judgment where both parties have had ample opportunity to explore the merits of their cases and examination of the case makes it clear that one party has failed to establish the existence of an essential element in the case, on which that party will bear the burden of proof at trial. *See* Fed.R.Civ.P. 56(c). Where the movant can show a complete failure of proof concerning an essential element of the nonmoving party's case, all other facts become immaterial because there can be "no genuine issue of material fact." In this case, the defendants are "entitled to judgment as a matter of law" under Rule 56(c) because the plaintiffs have failed to make a sufficient showing on an essential element of their case with respect to which they have the burden of proof. *Celotex v. Catrett*, 477 U.S. 317, 322–323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Specifically, plaintiffs have failed to show that they were deprived of a constitutional right under 42 U.S.C. § 1983. Further, when their claims are considered under 42 U.S.C. § 2000bb (the Religious Freedom Restoration Act), they cannot show that any actions by the defendants placed a substantial burden on their exercise of the fundamental tenets of their religion.

▮ The federal court is charged with liberally construing the complaints filed by *pro se* litigants, to allow them to fully develop potentially meritorious cases. *See Cruz v. Beto*, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) and *Haines v. Kerner*, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). The court's function, however, is not to decide issues of fact, but to decide whether there is an issue of fact to be tried. The requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts which set forth a federal claim, *Weller v. Department of Social Services*, 901 F.2d 387 (4th Cir. 1990), nor can the court assume the existence of a genuine issue of material fact where none exists. If none can be shown, the motion should be granted. Fed.R.Civ.P. 56(c).

The movant has the burden of proving that a judgment on the pleadings is appropriate. Once the moving party makes this showing, however, the opposing party must respond to the motion with "specific facts showing that there is a genuine issue for trial". The opposing party may not rest on the mere assertions contained in the pleadings. Fed. R.Civ.P. 56(e) and *Celotex v. Catrett, supra*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Both Rule 56 and the *Celotex* case require that the plaintiffs come forward and present this court with specific facts showing how the actions by defendants substantially burdened their exercise of their religion. Plaintiffs' response to the motion for summary judgment, however, contained the same generalized allegations as did their complaint. They failed to provide any facts whatsoever showing that their exercise of religion was substantially burdened by any actions of the defendants. Any burdens or restrictions placed on their exercise of religion were, in fact, due to the mere fact of plaintiffs' incarceration. Despite the natural restriction of movement occasioned by plaintiffs' incarceration, the defendants and other prison authorities provided a time and place for these inmates to worship. Their refusal to "aid" the plaintiffs' exercise of religion, beyond the aid offered to all inmate religious groups, was a legitimate reaction to the tension between the Free Exercise Clause and the Establishment Clause of the First Amendment. Plaintiffs have failed to make a threshold showing that their religious freedoms or expressions were substantially bur-

---

18. This immunity would extend only to actions taken prior to the effective date of the RFRA.

dened by any actions of the defendants. Having failed to make this threshold showing under either 42 U.S.C. §§ 1983 or 2000bb (the Religious Freedom Restoration Act), the defendants are entitled to summary judgment.

### G. Plaintiffs' outstanding motions to certify a class action, for injunctive relief, and for sanctions.

A Report and Recommendation was filed September 9, 1994, addressing a number of plaintiffs' motions including plaintiffs' motion to certify the action as a class and for injunctive relief. As noted in the magistrate judge's report, courts do not generally certify class actions where the representative plaintiff is proceeding *pro se*. *See Oxendine v. Williams*, 509 F.2d 1405 (4th Cir.1975). Further, the class sought to be certified would involve in excess of 80 inmates, an unworkable number of *pro se* litigants to transport to and from court and to allow to file pleadings in this case. As the preceding order reflects, the named plaintiffs have been unable to meet their threshold burden of showing that they were substantially burdened in their free exercise of their religion. Any inmates who might have been included in the proposed class action, who can show some deprivation of rights under either 42 U.S.C. §§ 1983 or 2000bb, would have an adequate remedy to protect their rights without unnecessarily complicating the instant suit. *See Head v. Jellico Housing Authority*, 870 F.2d 1117 (6th Cir.1989) and *Arney v. Finney*, 967 F.2d 418 (10th Cir.1992). Plaintiffs' requests for certification of a class action are moot.

The court has also considered the plaintiffs' series of motions requesting preliminary injunctions or temporary restraining orders. Since review of the entire case indicates that the plaintiffs are not entitled to relief, the requests for preliminary injunctions or temporary restraining orders are moot.

Plaintiffs also filed a motion for sanctions based on their belief that the defendants failed to serve their response to plaintiffs' motion to amend on the plaintiffs. Inasmuch as plaintiffs' motion was granted, no prejudice occurred. Defendants have stated that this failure was inadvertent. Contrary to the general tone of plaintiffs' motion for sanctions, there is no indication that the omission was willful or repetitive. Plaintiffs' motion is denied.

### H. Conclusion

After reviewing the entire record, including the magistrate judge's report, objections filed by plaintiffs, and the applicable law, the court finds that there is no genuine issue as to any material fact and that the defendants are entitled to judgment as a matter of law. It is therefore

ORDERED that the defendants' motion for summary judgment be and hereby is granted. It is further

ORDERED that the plaintiffs' motions for summary judgment and for partial summary judgment be denied. Plaintiffs' motions to certify a class action and for injunctive relief are moot. Their motion for sanctions is denied.

IT IS SO ORDERED.