**Ali SHAHEED, et al., Plaintiffs,**

v.

**Andrew J. WINSTON, et al., Defendants.**

**Civ. A. No. 3:93CV867.**

United States District Court,
E.D. Virginia,
Richmond Division.

May 5, 1995.

Sa'ad El–Amin, El–Amin & Crawford, P.C., Richmond, VA, for plaintiffs.

Sarah Jane Chittom, John Adrian Gibney, Jr., Shuford, Rubin & Gibney, Richmond, VA, for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

RICHARD L. WILLIAMS, Senior District Judge.

This matter is before the Court for resolution following a bench trial conducted on April 3–4, 1995. The Court makes the following Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52:

### I. FINDINGS OF FACT

1. Plaintiffs Michael Wayne Davis ("Davis"), Ivan Mallory ("Mallory"), Rachman Farrakan ("Farrakan"), Curtis Price ("Price"), and Terrance Hicks ("Hicks") were all incarcerated in the Richmond City Jail ("the City Jail" or "the Jail") for varying periods of time between August 1992 and January 1994.

2. Plaintiff Ali Shaheed ("Shaheed") is the Minister of Muhammad Temple of Islam 24, Nation of Islam, which is located in the City of Richmond. The Nation of Islam ("the Nation") is a religious body organized and grounded on the teachings of the honorable Elijah Muhammad.

3. The plaintiffs have filed this suit pursuant to 42 U.S.C. § 1983 alleging violations of their First Amendment right to free exercise of religion, their Fourteenth Amendment right to equal protection of the laws, and their right to be free from governmental discrimination under article 1, section 11 of the Constitution of Virginia. Plaintiff Shaheed's First Amendment claim was dismissed prior to trial. The plaintiffs seek a declaratory judgment, injunctive relief, money damages, and attorney's fees.

4. All of the plaintiffs except Davis are members of the Nation. While serving his sentence at the City Jail, Davis was studying various Islamic sects, and he ultimately became a Sunni Muslim. (Test. of Davis).

5. Defendant Andrew J. Winston ("Winston") was the duly-elected Sheriff of the City of Richmond until December 31, 1993 when he retired after twenty-three years in that position. One of his duties was the operation of the City Jail. (Test. of Winston). Defendant Michelle Mitchell ("Mitchell") succeeded Winston as Sheriff following her election in November 1993. Prior to becoming Sheriff, she served as the Director of Correctional Services and as Major and Chief of Operations at the City Jail. (Test. of Mitchell).

6. The Richmond City Jail is severely overcrowded. When the Jail was built, its rated capacity was 629 inmates. Several years ago, the rated capacity rose to 875 when an addition for female inmates was built. During the time period at issue in this suit, between 1400 and 1500 inmates occupied the Jail. (Test. of Winston).

7. The number of Christians at the City jail is larger than the number of Nation of Islam members. (Test. of Winston).

### A. Organization of Religious Activities at the City Jail

8. The present Chaplain service at the City Jail is organized and funded by Willing Workers Ministry ("Willing Workers"), not by public funds. (Test. of Mitchell). The Willing Workers Board is open to ministers of all faiths. (Test. of Mitchell). The Chaplain at the Jail is a Christian. (Test. of Mitchell).

9. Ministers other than the Chaplain are permitted to come to the Jail, counsel inmates, and conduct services. For example,

Shaheed serves in this role for the Nation of Islam. (Test. of Shaheed). Carroll Malik ("Malik") is the Imam for Sunnites in the jail. (Test. of Malik.). Catholic inmates are ministered to by Catholic priests. (Test. of Winston).

10. Each religious faith represented at the jail is entitled to appoint an "inmate coordinator" subject to approval from the jail administration. Shaheed appoints the inmate coordinator for the Nation of Islam. (Test. of Shaheed).

11. Religious services and meetings at the City Jail take place either in the Chapel, which can accommodate approximately 50 people, or the dining hall, which holds approximately 350. (Test. of Winston).

## B. Attending Religious Services

12. Nation of Islam services take place each Sunday at 8:30 a.m. in the City Jail's dining hall.

13. Between 9:00 a.m. and 11:00 a.m. each Friday, the Nation of Islam inmate coordinator may travel throughout the jail, signing up inmates who wish to attend the following Sunday's services. (Test. of Mallory; Pls.' Ex. 2).

14. During the time period at issue in this suit, only inmates who had signed up in advance were permitted to attend Sunday services. (Test. of Mallory and Davis). Catholics and Sunni Muslims have also been required to sign up in advance before being allowed to attend services. (Test. of Winston).

15. Nation of Islam members were required to sign up in advance because they were scattered throughout the jail, and the procedure was thought necessary to promote order and security at the overcrowded facility. (Test. of Winston).

16. As of March 13, 1994, the sign-up sheets have been eliminated on a trial basis. (Test. of Mitchell). As long as this policy does not result in security problems, Nation of Islam members will no longer be required to sign up in advance for Sunday Services. (Test. of Mitchell).

17. On occasion, inmates wishing to attend Nation of Islam services were unable to do so because their names were mistakenly left off of the approved list or they were unable to sign up with the inmate coordinator. (Test. of Davis, Mallory, Farrakan, Price). Additionally, inmates wishing to attend Nation of Islam services periodically missed those services because they did not respond promptly when the gates were opened and the inmates were escorted to the dining hall. (Test. of Davis).

18. A Protestant Christian religious service takes place every Sunday evening in the dining hall at the City Jail. Because the number of inmates wishing to attend this service is so large, not all inmates are permitted to attend each week. Instead, each inmate has the opportunity to attend every third Sunday. (Test. of Winston).

19. Inmates attending Protestant Christian services on Sunday are not required to sign up in advance. The gate on the tier is opened, and guards accompany those inmates wishing to attend the service to the dining hall. The gate remains open for a few minutes only. Any inmate who is not prepared when the service is called is locked in the tier and able to attend only if a guard allows him to. (Test. of Winston and Mitchell).

20. Along with attending Sunday services, Protestant Christian inmates may also participate in Bible Study classes on Monday and Wednesday evenings in the Chapel, and other Christian-oriented activities. (Pls.' Ex. 1). The Bible Study classes are much smaller than the Sunday services, and inmates who wish to attend must sign up in advance. (Test. of Mitchell).

21. In addition to conducting Sunday services for the Nation of Islam, Shaheed presided over services on Wednesday evenings for a number of years. (Test. of Shaheed). The Wednesday services were more popular because inmates preferred to sleep later on Sunday mornings. (Test. of Shaheed). Following an escape at the jail, the Wednesday evening service was cancelled. On March 13, 1994, Mitchell agreed to allow Shaheed to conduct services on Thursday evenings. As of the date of trial, Nation of Islam services

were being conducted on both Sundays and Thursdays. (Test. of Shaheed).

22. Nation of Islam members have also been permitted to engage in other activities related to their faith. (Defs.' Ex. 4).

## C. Attitude and Treatment by Jail Officials

23. Nation of Islam members are not released from their tiers to attend the Sunday service until the minister conducting the service has arrived. (Test. of Winston). Because of the time required to move inmates from the tiers to the dining hall and because of the occasional tardiness of the minister, Nation of Islam services do not always begin at the time scheduled. (Test. of Davis and Winston).

24. Nation of Islam services occur in the dining hall before lunch. Jail officials have interrupted services in order to move the inmates out of the dining hall and begin preparing the meal. (Test. of Shaheed and Winston). Jail officials have also suspended the gatherings of other groups in order to make sure that the dining hall was ready for meals at the scheduled hour. (Test. of Winston).

25. Jail officials sometimes fail to treat inmates with respect when interrupting the Nation's services. (Test. of Shaheed). Such disrespectful behavior is not authorized by the Sheriff. (Test. of Winston).

26. After each meal, the floor of the dining hall is mopped and the windows are opened to air out the room. (Test. of Winston). Nation of Islam Services occur after breakfast, and in the winter, the room is often cold because the windows are open. (Test. of Shaheed).

27. If Shaheed arrives at the City Jail more than ten minutes after the Nation's services are scheduled to begin, the services are canceled even though there are inmates capable of conducting the ceremonies. (Test. of Shaheed and Hicks). This policy of canceling services when the minister does not arrive on time applies to all religious groups. (Test. of Winston and Carroll Malik).

28. Religious services without outside ministers are not permitted because of the need to supervise inmates during the services. (Test. of Winston).

## D. Access to Inmates

29. Shaheed and his inmate coordinators are not permitted access to inmates on the tiers. (Test. of Shaheed and Hicks). Shaheed is required to conduct religious counseling in the visitor's room, and inmates who wish to see him are brought to the visitor's room by officials at the jail. (Test. of Shaheed). Shaheed is not permitted contact visits with inmates in the visitor's room. (Test. of Shaheed). He must conduct his counseling through a glass partition and communicate by using a telephone. (Test. of Shaheed).

30. Prior to March 1992, ministers of all faiths were allowed to meet with inmates in the attorney visiting rooms at the City Jail. (Test. of Winston). Sheriff Winston ended this privilege for all inmates because the overcrowded jail needed the space solely for attorneys meeting with clients. (Defs.' Ex. 5 and Test. of Winston). Other than for regularly scheduled group events, ministers are required to meet and counsel inmates in the visiting area, like other visitors. (Test. of Mitchell).

31. Because of the large number of Christians in the jail, the Christian ministers logistically needed more personnel to carry out their duties. Additionally, the Chaplain and the Chaplain's assistant have greater freedom to move about the Jail because they have administrative duties with respect to inmates of all faiths, not just Protestant Christians. (Test. of Ben Murray).

32. In particular, two individuals, Ben Murray ("Murray") and a man named Mickey, have assisted the Chaplain. Ben Murray was the Chaplain's assistant while he was an inmate at the City Jail. (Test. of Murray). Although Murray was a state prisoner, Winston requested that he remain at the City Jail and not be transferred to the state system. (Test. of Winston). Sheriffs in Virginia commonly make this request in order to retain inmates with special skills needed at the jail. (Test. of Winston). Murray was a valuable assistant to the Chaplain. (Test. of Winston). Murray has been released from

jail and now is paid by the Willing Worker's Ministry to continue assisting the Chaplain. (Test. of Murray).

33. Mickey was a volunteer who counseled inmates at the City Jail. (Test. of Winston). For a period of time, he was permitted to walk back on the tiers, and he occasionally would promote the Christian Faith. (Test. of Davis). Since April 1994, no volunteers, including Mickey, have been permitted to walk back on the tiers at the jail. (Test. of Mitchell). Sheriff Mitchell took this action because she feared for the safety of the volunteers given the overcrowding at the City Jail. (Test. of Mitchell).

### E.  Celebration of Ramadan

34. In Islam, Ramadan is an annual event in which Muslims fast from sunrise to sunset during a one-month period. Ramadan is one of the five Pillars of Islam and is an important event in the lives of Muslims.

35. In 1994, officials at the City Jail made accommodations for inmates wishing to celebrate Ramadan. (Defs.' Ex. 3). They were served breakfast before dawn and given a meal to eat after sunset. No such accommodations were made in 1993. The failure to accommodate Ramadan in 1993 resulted from confusion on the part of officials at the jail concerning the time of year when different Islamic sects celebrate the holiday. (Test. of Mitchell). The defendants acted negligently, not intentionally, in failing to provide the necessary accommodations.

### F.  The Nurture Tier

36. The City Jail has a number of specialized tiers. Among those tiers are the Substance Abuse/Human Development Tier, the School Tier, and the Nurture Tier. (Test. of Winston). The Nurture Tier has rules and a curriculum designed to promote good order and cooperation among inmates in the tier. (Test. of Winston). Bible study was part of the tier's curriculum. (Test. of Murray). The Nurture Tier was sometimes referred to as the "Christian Tier." (Test. of Winston and Murray). Inmates wishing to be housed

on the Nurture Tier had to apply to the Chaplain's office. (Test. of Murray).

37. Sheriff Winston approved the Nurture Tier in the belief that it might promote rehabilitation and decrease recidivism among the inmates. (Test. of Winston).

38. Shaheed spoke to Winston about establishing a Muslim Tier. (Test. of Shaheed and Winston). Winston agreed to look into the matter. (Test. of Shaheed and Winston). Neither Shaheed nor Winston followed up on the matter, and no Muslim Tier was ever developed at the City Jail. (Test. of Winston).

39. The Sheriff has the authority to assign inmates to any of the special tiers even if the inmates do not meet the standard qualifications for the tiers. (Test. of Winston). Thus, the special tiers, including the Nurture Tier, can be used as a "safe haven" for inmates needing protection at the jail. (Test. of Winston).

40. The Nurture Tier is being phased out because the jail is overcrowded and the tier occasionally had empty beds. (Test. of Mitchell).

## II.  CONCLUSIONS OF LAW

### A.  Free Exercise Claims

#### 1.  Access to Religious Services and Counseling

1. The plaintiffs claim that the defendants violated their rights under the Free Exercise Clause of the First Amendment by requiring Nation of Islam members to sign up before attending Sunday Services, cutting short the plaintiffs' religious services, and limiting Minister Shaheed's access to inmates outside of the visiting area.

2. The Court must judge the actions challenged by the plaintiffs "under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987).[1]

---

1. The Court is familiar with the Religious Freedom Restoration Act of 1993 ("RFRA"). 42

U.S.C. §§ 2000bb to 2000bb-4. A number of courts have interpreted RFRA to overturn the

The jail regulations must be "reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987).

■ 3. The judgment of jail officials in this instance is entitled to deference because "the evaluation of penological objectives is committed to the considered judgment of prison administrators, 'who are actually charged with and trained in the running of the particular institution under examination.'" *O'Lone,* 482 U.S. at 349, 107 S.Ct. at 2404 (quoting *Bell v. Wolfish,* 441 U.S. 520, 562, 99 S.Ct. 1861, 1886, 60 L.Ed.2d 447 (1979)).

■ 4. In *Turner v. Safley,* the Supreme Court set fourth a four-part test for determining the constitutionality of prison regulations. 482 U.S. 78, 107 S.Ct. 2254 (1987). First, the Court must "examine the prison regulations and the governmental interests justifying them to see whether they are reasonably related." *U.S. v. Stotts,* 925 F.2d 83, 86 (4th Cir.1991). In this case, the defendants contend that the challenged actions were necessary to maintain order in an overcrowded facility. (*See* Findings ¶¶ 15–16, 24, 28, 30, 37, 39). The sign-up sheets, the restricted access to inmates, and the strict adherence to the schedule for feeding inmates and moving them around the jail were necessary to keep the facility running in a smooth and orderly fashion. (*See* Findings ¶¶ 15–16, 24, 28, 30, 37, 39).

5. "Institutional order and security" is a legitimate governmental interest. *O'Lone,* 482 U.S. at 350, 107 S.Ct. at 2405. *See also*

*Pell v. Procunier,* 417 U.S. 817, 823, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974) (noting that internal security is "central to all other corrections goals."). The Court finds no reason to question the judgment of the jail officials on this issue.

6. The second *Turner* consideration is "whether there are alternative means of exercising the right that remain open to prison inmates." *Turner,* 482 U.S. at 90, 107 S.Ct. at 2262. Members of the Nation of Islam have been given a number of opportunities to exercise their religious beliefs in the City Jail. Although they may have missed services on occasion or been forced to participate in shortened sessions, they have not been precluded from following the teachings of their faith. (*See* Findings ¶¶ 21–22, 35). Moreover, the sign up sheets have been eliminated and there are now two services available for Nation of Islam members each week. (*See* Findings ¶¶ 16, 21).

7. The third factor under *Turner* is the impact that accommodating the inmate's right will have on guards, other inmates and the allocation of prison resources generally. *Id.* The defendants have explained that some of the requested accommodations would prevent the jail from following an orderly schedule, thereby threatening the security of guards and inmates. (*See* Findings ¶ 15–16, 28, 30, 37, 39). Other accommodations have been enacted on a trial basis, and if they do not interfere with the safe operation of the jail, they will continue. (*See* Findings ¶¶ 16, 21).

8. Under the fourth prong of the *Turner* analysis, the Court must examine whether or

---

reasonableness standard applied in *O'Lone.* These Courts have found that the new act requires the use of a "compelling interest" test in free exercise clause cases involving prison inmates. *See, e.g., Werner v. McCotter,* 49 F.3d 1476 (10th Cir.1995); *Bryant v. Gomez,* 46 F.3d 948 (9th Cir.1995) (per curiam); *Brown–El v. Harris,* 26 F.3d 68 (8th Cir.1994). On March 24, 1995, ten days before the trial was scheduled to begin, plaintiff's counsel attempted to amend the complaint to allege violations of RFRA. He waited until this date despite the fact that RFRA took effect on November 16, 1993 and the original complaint was filed on December 30, 1993. Therefore, in order to avoid prejudice to the defendant, the Court denied the plaintiff's motion to amend. Since the complaint before the Court

does not allege violations of RFRA, the Court will analyze the plaintiff's claims without applying the Act. *See, Brown–El,* 26 F.3d at 69 (refusing to apply RFRA because the plaintiff "failed to raise or otherwise bring his claim under the Act."); *Levinson–Roth v. Parries,* 872 F.Supp. 1439, 1453 (D.Md.1995).

Moreover, even if the Court were to apply RFRA, the plaintiffs would not be able to show that the challenged actions substantially burdened their free exercise of religion. 42 U.S.C. § 2000bb–1. *See also Woods v. Evatt,* 876 F.Supp. 756, 762 (D.S.C.1995). For the reasons set forth in ¶¶ 6–7 of these Conclusions of Law, *infra,* the Court finds that there has been no substantial burden on the plaintiffs' free exercise of their religion.

not any ready alternatives exist. *Id.* Other than the reforms already enacted by the defendants, no party has offered, nor can the Court imagine, any ready alternatives.

9. Based on the *Turner* analysis, the Court finds that the challenged policies related to attendance of religious services, length and frequency of services, and inmates' access to religious counseling were reasonably related to legitimate penological interests. The policies imposed by the defendants were necessary to maintain order and security at the City Jail.

### 2. Ramadan 1993

■ 10. The plaintiffs also contend that Winston and Mitchell violated their free exercise rights by failing to accommodate the observance of Ramadan in 1993. The Court has found that the defendants acted negligently with respect to Ramadan that year. (*See* Findings ¶ 39). Therefore, for the plaintiffs to succeed on this claim, they must show that negligence can give rise to a cause of action in these circumstances.

■ 11. 42 U.S.C. § 1983, the basis for the plaintiffs' cause of action in this case, does not include an independent state-of-mind requirement. *Parratt v. Taylor,* 451 U.S. 527, 534–35, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981). Thus, the Court must look to the underlying constitutional right to determine whether allegations of negligent deprivations will suffice to state a claim in any particular § 1983 action. *Daniels v. Williams,* 474 U.S. 327, 330, 106 S.Ct. 662, 664, 88 L.Ed.2d 662 (1986). For example, in *Daniels,* the Supreme Court found that "the Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property." *Id.* at 328, 106 S.Ct. at 663. More recently, the Fourth Circuit held that prisoners have no right of action under § 1983 for negligent interference by prison officials with the prisoners' right of action to the courts. *Pink v. Lester,* No. 93–6227, 52 F.3d 73, 74 (4th Cir.1995).

12. In *Pink,* a state prisoner did not file a timely notice of appeal because prison officials negligently failed to mail the prisoner's

money order to the court. The prisoner argued that these actions violated the First Amendment's prohibition against "abridging . . . the right of the people . . . to petition the Government for a redress of grievances." The Court affirmed summary judgment against the prisoner, relying in part on the argument that "an 'abridgement' connotes a conscious act that cuts off something from something else, . . ." *Id.* at 76. The Court also noted that "[t]he expansion of § 1983 to instances of mere negligence foreshadows further interference with the operations of state penal institutions. The significant costs that would be imposed by such suits, without the benefit of remedying federal wrongs, are unjustifiable." *Id.* at 77.

13. A similar argument can be made with respect to the case before this Court. The word "prohibiting" in the Free Exercise Clause suggests "a conscious act," rather than mere negligence. Thus, this Court finds that the defendants are not liable for negligent violations of the plaintiffs' right to free exercise of religion. *See Salih v. Smith,* Civ. Nos. HAR 93–1556, 93–1619, 1994 WL 750529, at *10 (D.Md. Nov. 8, 1994). Since the failure to accommodate Ramadan in 1993 resulted from a misunderstanding (*see* Findings ¶ 39), the defendants actions were negligent, not intentional, and the plaintiffs may not rely on § 1983 as a basis for this claim.

14. Therefore, the Court finds for the defendants and against the plaintiffs on the free exercise claims. Neither injunctive relief nor money damages would be appropriate.

### B. Equal Protection

15. Plaintiffs also claim a violation of their equal protection rights, alleging that Christian inmates were given greater access to religious services and religious materials than were members of the Nation of Islam. In addition, the plaintiffs contend that Christian inmates received better treatment from guards and had the chance to live on the more civilized "Nurture Tier" in the jail.

■ 16. The *Turner* standard of review "applies to all circumstances in which the needs of prison administration implicate con-

stitutional rights." *Washington v. Harper,* 494 U.S. 210, 224, 110 S.Ct. 1028, 1038, 108 L.Ed.2d 178 (1990). Thus, if the plaintiffs can show a violation of their equal protection rights, the Court must engage in the *Turner* analysis to determine if the challenged jail policies are reasonably related to legitimate penological interests.

17. Before reaching the *Turner* analysis, however, the Court must first determine whether a constitutional violation has occurred. "Unless ... plaintiffs can show the challenged regulation impinges on a constitutional right ... the *Turner/O'Lone* reasonable relation to legitimate penological interest test is not properly invoked." *Salaam v. Collins,* 830 F.Supp. 853, 859 (D.Md.1993).

 18. To show that the challenged policies violate their equal protection rights, the plaintiffs must provide evidence that a "discriminatory purpose" was a motivating factor in the defendants' actions. *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Arlington Heights v. Metropolitan Housing Development Corporation,* 429 U.S. 252, 265–66, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977).

19. The plaintiffs have shown no evidence of a discriminatory purpose on the part of either defendant. Moreover, the defendants' willingness to change their policies when confronted by the plaintiffs suggests that discrimination was not a motivating factor behind the challenged policies. (*See* Findings ¶¶ 16, 21).

20. It should also be noted that much of the alleged disparity in treatment between Nation of Islam members and Christians arose because Christians outnumber members of the Nation at the City Jail. (*See* Findings ¶¶ 7, 15). Disparate treatment on this basis does not necessarily give rise to a constitutional violation. *See Woods v. Evatt,* 876 F.Supp. 756, 766 (D.S.C.1995). Not every "religious sect or group within a prison— however few in number—must have identical facilities or personnel." *Cruz v. Beto,* 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972).

21. Therefore, the Court finds for the defendants and against the plaintiffs on the equal protection claims. Neither equitable relief nor money damages would be appropriate.

22. Because the antidiscrimination clause in article 1, section 11 of the Constitution of Virginia is no broader than the equal protection clause of the Fourteenth Amendment to the United States Constitution, the Court finds for the defendants and against the plaintiffs on the plaintiffs' state law claim as well. *See, Archer v. Mayes,* 213 Va. 633, 638, 194 S.E.2d 707, 711 (1973).

Let the Clerk send a copy of these Findings of fact and Conclusions of law along with the accompanying Order to all counsel of record.