**Duke WOODLEY, Petitioner,**

v.

**DEPARTMENT OF CORRECTIONS, Respondent.**

**No. Civ.A. 3:99CV156.**

United States District Court, E.D. Virginia, Richmond Division.

Nov. 17, 1999.

---

3. More importantly, they may not be covered by the insurance on the vehicle.

Duke Woodley, Capron, Va, pro se.

William Wayne Muse, Office Of Attorney General of Virginia, Richmond, VA, for Department of Corrections, respondent.

## MEMORANDUM OPINION

LOWE, United States Magistrate Judge.

Duke Woodley, a Virginia state prisoner proceeding *pro se*, submitted a petition for a writ of habeas corpus challenging his parole revocation and the Virginia Parole Board's policy that requires him to serve the total remaining time of his sentences without consideration of the Good Conduct Allowances he had earned. Jurisdiction is appropriate pursuant to 28 U.S.C. §§ 2254 and 636(c)(3).

In his petition for a writ of habeas corpus, Woodley raises the following claims as grounds for relief [1]:

A) Petitioner was denied equal protection and due process of law when his parole was revoked based upon his refusal to agree to pay $1800 to reside in a halfway house for six months.

B) Petitioner's Good Conduct Allowance earned prior to release on parole was revoked in violation of the equal protection, due process and *ex post facto* clauses of the Constitution.

### Statement of the Facts

On August 9, 1988, in the Richmond City Circuit Court, Petitioner was sentenced to a two-year term of imprisonment for con-

---

1. Petitioner actually set forth four separate grounds for relief in his petition. They have been consolidated for purposes of this opinion.

spiracy and a three-year term for grand larceny. On August 28, 1988 Petitioner received a four-year sentence for perjury. In September 1988, he received three additional one-year sentences, one year of which was suspended. All sentences were imposed consecutively so that Petitioner had a total term of eleven years to serve. Petitioner was released on discretionary parole effective June 4, 1992. At that time, his term of confinement had been reduced by approximately three years because of Good Conduct Allowances (GCA).[2] He was arrested and returned to jail for violations of parole conditions on May 18, 1994. On September 9, 1994, Petitioner was sentenced in Fairfax County Circuit Court to a three-year consecutive term of imprisonment for fraudulent use of a credit card. Petitioner's parole was revoked on December 7, 1994. On April 21, 1998, after serving eight of the total of 14 years which had been imposed, Petitioner was released on mandatory parole with a minimum expiration date of October 21, 1998.[3] From the date his discretionary parole was revoked until the date of his mandatory parole, Petitioner earned approximately 1,185 days of GCA. Thus, a total of approximately 1,985 days in GCA had been applied to reduce Petitioner's maximum term of confinement when he was released on mandatory parole.[4]

Prior to his release, Petitioner agreed to a parole plan which required him to reside at the Onesimus House while on parole and he agreed to follow his parole officer's instructions. On April 22, 1998, one day after his release, Petitioner refused to reside at the Onesimus House because he felt the $1800 charge for six months rent was too high, and because he had been promised his parole officer would consider permitting him to reside in Virginia Beach or Washington, D.C.

The Virginia Parole Board, after finding Petitioner had violated his parole by refusing to comply with instructions to reside at Onesimus House revoked Petitioner's parole and re-committed him to the Virginia Department of Corrections (VDOC) to serve the remainder of his unserved sentence. On August 8, 1998, the VDOC notified Petitioner that "Effective 5–11–95 per policy of the Virginia Parole Board under VCS 53.1–159, all time not physically served on applicable sentences prior to mandatory parole, is revoked and has been added to the record." *See* Enclosure B of Respondent's Response to Court's Order of September 7, 1999. Petitioner's case was set for parole review in six months after his parole revocation. On January 26, 1999, the Parole Board denied parole due to the Petitioner's prior record with convictions and parole violations. After revocation of parole, Petitioner had six years, one month and 25 days remaining to serve in confinement.[5] Petitioner's antici-

---

**2.** An inmate may earn Good Conduct Allowances at rates varying from "thirty days credit for each thirty days served" to no credit at all. *See* Va Code § 53.1–201 (Michie 1998). A Good Conduct Allowance ". . . shall be applied to reduce the person's maximum term of confinement while he is confined in any state correctional facility. One-half of the credit allowed under § 53.10201 shall be applied to reduce the period of time a person shall serve before being eligible for parole." Va.Code § 53.1–199 (Michie 1998).

**3.** By statute, every prisoner must be released six months prior to his final discharge date and must serve a minimum of six months on parole. *See* Va Code § 53.1–159 (Michie 1998). The final discharge date is calculated by taking the total term of confinement and

deducting therefrom all GCA earned and anticipated to the date of release.

**4.** The record does not specifically delineate the amount of GCA Petitioner earned and the figure in the text is only an approximation based on the Respondent's filings in this case. The amount of GCA has never been in dispute in this case.

**5.** The term was calculated by adding the time left to serve on the sentence Petitioner was serving when paroled (eight months and one day) to the remainder of time on his sentences (five years, five months and 24 days). This calculation does not include future reductions in time served from GCA.

pated release date with GCA earned since his violation date is now July 20, 2002.

Petitioner executed a petition for writ of habeas corpus which was summarily denied by the Supreme Court of Virginia on November 12, 1998. Petitioner's claims have been presented to the highest State court and are therefore properly exhausted.

### Analysis

 Woodley bears a substantial burden in proving his claims and receiving a writ of habeas corpus. The passage of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. 104–132, 110 Stat. 1214, 28 U.S.C. § 2254, effectively raised the standard of review a federal court must apply to habeas petitions. Rather than employing a *de novo* review, relief in a federal court must be denied unless the state court decision is contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. *See* 28 U.S.C. § 2254(d)(1–2). In applying this standard, the court "must decide (1) what was the decision of the state courts [sic] with regard to the questions before us and (2) whether there is any established federal law as explicated by the Supreme Court, with which the state court decision conflicts." *Hoover v. Johnson,* 193 F.3d 366, 368 (5th Cir.1999); *see also Bocian v. Godinez,* 101 F.3d 465, 471 (7th Cir.1996) ("Federal courts no longer permitted to apply their own jurisprudence, but must look exclusively to the Supreme Court case law"). Here, the Virginia Supreme Court has ruled on the merits in a single paragraph order, finding that the Petitioner's habeas petition was frivolous. The Fourth Circuit has found such a ruling to be on the merits for habeas review purposes. *See Wright v. Angelone,* 151 F.3d 151, 159–60 (4th Cir. 1998); *Parker v. Angelone,* 959 F.Supp. 319, 320–322 (E.D.Va.1997). Federal courts will defer to a state court's decision unless "reasonable jurists considering the question would be of one view that the

state courts ruling was incorrect" or that the decision was "not debatable among reasonable jurists." *McLee v. Angelone,* 967 F.Supp. 152, 156 (E.D.Va.1997) (internal citations omitted); *see also Green v. French,* 143 F.3d 865 (4th Cir.1998). The Court therefore examines the substance of Petitioner's claims to consider if the decision of the Virginia Supreme Court is an unreasonable application of settled federal law as explicated by the Supreme Court of the United States.

### Due Process and Equal Protection for Parole Conditions

It is clear that Petitioner was required by law to comply with all conditions of parole imposed upon him, notwithstanding his release was on "mandatory parole." "Such persons shall also be subject, for the entire period of parole fixed by the Board, to such terms and conditions prescribed by the Board in accordance with § 53.1–157." Va Code § 53.1–159 (Michie 1998). Nor is it disputed that Petitioner agreed as a condition of parole that he would reside at Onesimus House for the duration of his parole period. He asserts, however, the Parole Board could not require that he obligate himself to pay for his room, board and other costs incurred while living at the Onesimus House.

 What little law there is on the subject supports the proposition that a state may require a prisoner to pay the costs of supervision as a condition of parole. *See Taylor v. Rhode Island,* 101 F.3d 780 (1st Cir.1996); *cf. Alexander v. Johnson,* 742 F.2d 117 (4th Cir.1984) (finding the State may require inmate to make restitution as a condition of work release). The Supreme Court of Virginia, in rejecting Petitioner's claim, has held that as a condition of mandatory parole, the state may require an inmate to live at a halfway house and pay his costs while residing there. There is no Supreme Court case holding or even hinting to the contrary. Accordingly, revocation of Petitioner's parole for failing to agree to pay costs while living at Onesimus

House presents no cognizable constitutional grounds for relief. Claim one will be DENIED.

### Due Process and Parole Policy Change

Next, Petitioner asserts the forfeiture of his GCA earned prior to his mandatory release violated the due process, equal protection and *ex post facto* clauses of the Constitution. In fact, the Parole Board never ordered that Petitioner's GCA be forfeited, and it is doubtful that the Board has such power. *See* Va.Code § 53.1–189 (Michie 1998) (limiting the forfeiture of GCA to 1) violations of *prison rules and regulations* (not parole) and 2) for escapes from confinement).

■ What the parole board actually did was to order Petitioner to serve "the unserved portion of the term of imprisonment originally imposed upon him...." Va.Code § 165A (Michie 1998). In this sense, the powers of the Parole Board under section 53.1–165 are more extensive than those of the VDOC under section 53.1–189.[6] The procedures necessary to revoke parole afford an individual more protection than those required for forfeiture of GCA. *See Wolff v. McDonnell,* 418 U.S. 539, 559, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Constitutional due process requires that prior to revocation of his parole and reinstatement of his unserved sentences, Petitioner must have received advance notice of the charges; a hearing with the opportunity to call witnesses and present evidence; and a written statement of the fact finder's basis for imposing disciplinary action. *See Morrissey v. Brewer,* 408 U.S. 471, 489, 92 S.Ct. 2593, 33 L.Ed.2d 484, (1972) (articulating the minimum due process requirements for revocation of parole). *See also Wolff,* 418 U.S. at 563–567, 94 S.Ct. 2963 (establishing minimum due process standards for the revocation of good-time credits). Petitioner does not claim he was denied any of the required due process rights, nor does he assert he did not commit the alleged violation. Indeed, he readily admits he refused instructions to agree to stay at the halfway house.

■ The statute gives the Parole Board "in its discretion, may revoke the parole and order the reincarceration of the prisoner for the unserved portion of the term of imprisonment originally imposed upon him...." Va Code § 53.1–165. Petitioner's liberty interest in remaining free from serving the unserved portion of this term of confinement is certainly no greater than his liberty interest in retaining GCA while in prison or his liberty interest in remaining on parole. Accordingly, when Petitioner was afforded the rights due in his parole revocation proceedings, he received all of the constitutional due process right to which he was entitled. The Petitioner's due process claim is therefore DENIED.

### Equal Protection and Policy Change

■ Next, Petitioner asserts he was denied equal protection when the Parole Board changed its policy to require that all persons violating parole after May 11, 1995, serve the entire unserved portion of the term originally imposed upon them. Presumably Petitioner is asserting that prisoners who violated parole after May 11, 1995, were treated differently than those prisoners who violated parole before that date. Section 53.1–165 was in effect when Petitioner was sentenced in 1988 and remains in effect today. The only thing that has changed is the decision of the Parole Board to exercise its broad discretion under the statute to require that all

---

6. The unserved portion of any sentence may consist in part of GCA, but it may include other items which may be earned to shorten a period of confinement. For example, credits may be awarded for blood donations, extraordinary services or assistance in preventing an escape. *See* Va.Code § 53.1–191 (Michie 1998). Those credits are not subject to forfeiture but they would, by definition, constitute an unserved portion of a term of confinement, which a parole violator might be required to serve. *See* Va.Code § 53.1–189 (Michie 1998).

inmates who violate parole after May 5, 1991, serve the unserved portion of their term of confinement.

Factually, there is no question that, but for the new policy, Petitioner would have been required to serve only the remaining portion of the four-year sentence he was serving at the time he was released on mandatory parole. Now, however, he may be required to serve an additional five years, based on the total of unserved time on each of his sentences.

At the time he was sentenced in 1988, by virtue of the then existing parole board policy, he was entitled to "complete" service of each sentence imposed individually once he had served the required term less GCA. Once "completed" he would commence serving the next sentence which would also be "completed" when he served the term imposed less GCA, and so on until he commenced serving the last sentence imposed. Importantly, under the old policy, once a sentence was "completed," it was treated as though the inmate had served it in its entirety when he was paroled. For example, an inmate receiving four consecutive one-year sentences on February 4, 1992 would be treated as though he were serving four discrete sentences. Here, earning maximum GCA, the inmate would receive six months GCA for every six months served. Thus, at the end of six months, he would have completed his first sentence; at the end of twelve months, he would have finished his second sentence; at the end of eighteen months he would have completed his third sentence. He would have a remaining sentence of twelve months. After serving an additional three months, he would have served one half of his remaining sentence, leaving him only six months remaining (with anticipated good time). Because he was entitled to mandatory parole six months before the expiration of his sen-

tence, he would be immediately released on mandatory parole on May 4, 1995. Now, if he violated parole the same day, the parole board would treat all "completed" sentences as just that—they no longer existed. So when the prisoner was returned to prison the maximum time he would be required to serve would be the nine months remaining on his last sentence. Conversely, an inmate receiving exactly the same sentence on the same day, but who forfeits one day of GCA would be paroled on May 5, 1995. Assuming he violated parole the same day, he would not only be required to serve the remainder of the sentence he was serving, he would find that the parole board had resurrected each of the sentences he had previously "completed" and would require him to serve the remaining six months of each sentence because he had not "physically"[7] served those portions of his "completed" sentences. Essentially, that is what has occurred in Petitioner's case.

When he was released on discretionary parole in 1992, the unserved portion of Petitioner's "term of imprisonment originally imposed" would have been eleven years. During those eleven years he was in "physical custody" four years. Therefore, he had seven years of "unserved" time remaining on his original term of imprisonment. Two years later, Petitioner was returned to confinement because he had been convicted of an offense resulting in an additional sentence of three years. At that time, the parole board exercised its discretion and did not require him to serve the unserved term of confinement (seven years). Instead, the Parole Board required him to complete all time due on the sentences he was serving at the time he was paroled (The four-year perjury sentence and the two consecutive one-year sentences) plus the new three-year sentence.[8] Petitioner then "completed" ser-

---

7. Presumably the Virginia Parole Board's policy language is an attempt to convey that the inmate will be required to serve any unserved portion of his total sentences.

8. When he was released, his prison record reflected he had "completed for release" two sentences: The two-year conspiracy sentence and the three-year larceny sentence. He was

vice of his remaining sentences with the exception of the three-year sentence imposed on September 9, 1994. When he was released on mandatory parole on April 22, 1998, it was because he had "completed" all of his sentences except the three-year sentence and because he was within six months of "completing" service of that sentence. He had been physically confined for three years and eleven months since his return to prison. In total, Petitioner had been physically confined for a total of seven years and eleven months. The total of all sentences imposed was 14 years. When the Board revoked Petitioner's mandatory parole, instead of simply requiring him to serve the remaining time on his one remaining sentence, it added all his sentences together to arrive at a "total term of imprisonment originally imposed," subtracted from that figure all time physically spent in prison, arrived at the amount of time "not physically served" and added that time to the sentence Petitioner was serving when released.

To prove an equal protection violation, Petitioner must prove similarly situated people have been treated differently by a governmental entity without adequate justification. *See Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). The Petitioner must then prove that a "discriminatory purpose was a motivating factor in the [governmental] action." *Shaheed v. Winston,* 885 F.Supp. 861, 868 (E.D.Va.1995) (citing *Washington,* 426 U.S. at 229, 96 S.Ct. 2040).

The Petitioner's claim of an equal protection violation due to the revocation of the good time credits was thoroughly and correctly addressed in *Brown–El v. Parole Board,* 948 F.Supp. 558 (E.D.Va.1996). The similarities between *Brown–El* and Petitioner's case are numerous: both were released on mandatory parole after accruing several years of good time credits, and

still serving the four-year perjury sentence and the two consecutive one-year sentences when paroled.

both claim the post-parole revocation decision to ignore good time credits was inappropriate because the Virginia Parole Board changed its good time revocation policy after the prisoner was incarcerated on the original criminal charge. *See id.* at 559. Finally, both *Brown–El* and Petitioner were forced to serve sentences that exceeded the eight months left on their reduced sentences at the time of parole. *See id.*

Parole decisions are individualized determinations for each prisoner that involve a myriad of factors. Therefore it becomes impossible "to believe that any two prisoners could ever be similarly situated for the purpose of judicial review of an equal protection claim." *Reffitt v. Nixon,* 917 F.Supp. 409, 414 (E.D.Va.1996). The Petitioner has also not alleged any facts that suggest the Parole Board had a discriminatory purpose in adopting the 1995 policy changes or in using its discretion to determine the length of prison sentences before parole. This Court finds that *Brown–El's* claim of equal protection is identical to Petitioner's claim of equal protection case and the Court's analysis in *Brown–El* should be applied here: [9]

The effect of the new policy on parole violators was that the VPB would now incarcerate all violators and require them to serve the remainder of their sentence. Under the former policy, the VPB exercised its statutory discretion with the result that some violators were incarcerated while others were not. On these facts, the VPB did not treat petitioner differently from other parolees who violated the conditions of their parole prior to May 11, 1995. *Brown–El,* 948 F.Supp. at 561. The result is that Petitioner's equal protection claim is DENIED.

**9.** This Court has decided two similar cases and in both instances the holding of *Brown–El* has been precisely followed. *See Jones v. Angelone,* 2:98CV817 (May 19, 1999); *Alston v. Angelone,* 2:98CV475 (January 12, 1999).

### Ex post facto and Policy Changes

Petitioner's final claim is that the change in the good time credit policy has created an *ex post facto* application of the law. Criminal laws have an *ex post facto* effect if the law disadvantages the offender affected by it and it is retrospective, meaning it applies to events "occurring before its enactment so as to alter the legal consequences attached to a crime at the time the crime was completed." *Weaver v. Graham,* 450 U.S. 24, 29, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981). Parole conditions are part of the punishment determined by the trial court at sentencing. *See Warden v. Marrero,* 417 U.S. 653, 658, 94 S.Ct. 2532, 41 L.Ed.2d 383 (1974). It is clear that an *ex post facto* violation has occurred when the legislature "increases punishment beyond what was prescribed when the crime was consummated." *Weaver,* 450 U.S. at 30, 101 S.Ct. 960. The change in this case neither alters the definition of the prisoner's criminal conduct nor does it increase the punishment for his crime.

The *ex post facto* clause does not forbid any legislative change that has any conceivable risk of affecting a prisoner's punishment. *See California Dep't of Corrections v. Morales,* 514 U.S. 499, 508, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995). A law which is merely procedural and does not add to the quantum of punishment cannot violate the *ex post facto* clause even if it is applied retrospectively. *Weaver,* 450 U.S. at 29 n. 12, 101 S.Ct. 960. Thus a key question becomes whether or not the Virginia Parole Board's new policy is a law or a procedural change.

An administrative agency's actions can only involve an *ex post facto* claim if the agency develops legislative rules. *See United States v. Ellen,* 961 F.2d 462 (4th Cir.1992). The Virginia Parole Board is an administrative agency and does not create laws, but merely develops guidelines which it uses to set the terms of parole for prisoners on an individualized basis. A policy statement such as the one at issue in this case is not a law but is more akin to a guideline or recommendation. The *ex post facto* prohibition does not apply to a "change in guidelines assisting [a government agency] in the exercise of its discretion." *Portley v. Grossman,* 444 U.S. 1311, 1313, 100 S.Ct. 714, 62 L.Ed.2d 723 (1980) The *ex post facto* clause is inapplicable where parole guidelines or policy statements "do not have the force and effect of law but are merely policies that show how ... discretion is likely to be exercised." *Dufresne v. Baer,* 744 F.2d 1543, 1550 (11th Cir.1984). Clearly, in this case, the Virginia Parole Board's policy statement was issued to address how the Parole Board intended to use its statutory discretion in a manner different from past practices. The policy's existence does not prohibit the Parole Board from using its statutory discretion to make an exception to the policy for a given situation. The fact that the Parole Board intends to use its discretion in a blanket manner, by treating every parole violator in the same fashion, does not give the policy the force of a law that would then be subject to the *ex post facto* clause. *See Dufresne,* 744 F.2d at 1550 (regarding Federal Parole Commission adherence to its own guidelines); *see also Wallace v. Christensen,* 802 F.2d 1539, 1554 (9th Cir. 1986) ("Given the discretion retained by the [U.S. Parole] Commission, the frequency with which the Guidelines are followed does not convert the Guidelines into laws for purposes of the ex post facto clause.").

The Fourth Circuit has previously held that retroactive application of an amendment to a state's parole procedures does not violate the *Ex post facto* clause where the change was a procedural change that "may work to the disadvantage of a defendant." [10] *See Roller v. Gunn,*

---

**10.** In a federal sentencing context, the "Ex Post Facto Clause does not apply to retroactive application of changes in [federal sentencing] guidelines, since the guidelines are not 'laws.'" *Franzese v. Clark,* 732 F.Supp. 653, 653 (E.D.Va.1990) (internal citations

107 F.3d 227, 239 (4th Cir.1997) (regarding change in parole board voting requirements) (quoting *Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977)). A procedural change in parole policy is when the potential maximum sentence of a prisoner is not changed, meaning:

> The terms of the sentence originally imposed have in no way been altered. Applicant cannot be held in confinement beyond the term imposed by the judge, and at the time of his sentence he knew that parole violations would put him at risk of serving the balance of his sentence in custody. The guidelines, therefore, neither deprive applicant of any preexisting right nor enhance the punishment imposed.

*Portley v. Grossman,* 444 U.S. 1311, 1312–1313, 100 S.Ct. 714, 62 L.Ed.2d 723 (1980) (Rehnquist, C.J.) (acting as Circuit Justice in denying the stay of a Ninth Circuit decision that deemed a change in parole guidelines an procedural change). Here it is clear from the facts outlined above that the maximum sentence of the Petitioner has not been altered, only that the Petitioner is going to serve a greater portion of that sentence than if he had not been convicted of a parole violation. It is equally clear that there is no notice problem with the policy change, as the prisoner should be "on notice [at the time the crime was committed] that such an amendment [to the parole process] might well occur." *Dufresne v. Baer,* 744 F.2d 1543, 1548 (11th Cir.1984).

The Parole Board's change in its policies are purely discretionary acts involving procedural matters, taken within the range of their statutory powers. These acts are not legislative functions, and therefore no *ex post facto* issue exists. Accordingly, Petitioner's *ex post facto* claim is DENIED.

omitted); *see also United States v. Barrow,* 913 F.Supp. 458, 460 (E.D.Va.1996) ("guidelines operate within a statutory framework to guide judgment. By their nature, they are

Accordingly, there being adequate evidence to believe that the decision of the Virginia Supreme Court was not an unreasonable application of applicable federal law, the Respondent's Motion to Dismiss will be GRANTED and this action will be DISMISSED.

An appropriate Order shall issue.

'interpretive, rather than legislative' and 'may be discarded where circumstances require.' ") (internal citation omitted).