**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 8 2001**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

SAMUEL RAY WILGUS, Jr.,

      Defendant-Appellant.

No. 00-4015

---

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:99-CR-00047W)**

---

Joseph F. Orifici, Salt Lake City, Utah, for Defendant-Appellant.

Christopher B. Chaney, Assistant United States Attorney (Paul M. Warner, United States Attorney, with him on the brief), Salt Lake City, Utah, for Plaintiff-Appellee.

---

Before **BALDOCK**, Circuit Judge, **McWILLIAMS**, Senior Circuit Judge, and **EBEL**, Circuit Judge.

---

**EBEL**, Circuit Judge.

---

      This appeal asks whether the Bald and Golden Eagle Protection Act ("Act" or "BGEPA"), 16 U.S.C. §§ 668 - 668d, violates the religion clauses of the First

Amendment. The Act imposes criminal penalties on any person who knowingly "takes" or possesses bald or golden eagles, or any of their parts, including eagle feathers. See 16 U.S.C. § 668(a). It allows, however, the Secretary of the Interior to promulgate regulations which authorize takings or possession of these eagles when such possession is compatible with eagle preservation and "for the religious purpose of Indian tribes." See 16 U.S.C. § 668a. Regulations detailing this exception require that, for a person to legally possess eagle parts, he or she must (1) be a member of a federally recognized Indian tribe and (2) use the eagle parts for tribal religious ceremonies. See 50 C.F.R. § 22.22.

In response to Wilgus's free exercise challenge, we hold that the Act is a neutral, generally applicable law. Thus, it falls within the safe-harbor created by Employment Division v. Smith, 494 U.S. 872 (1990). As to his Establishment Clause claim, we reject Wilgus's contention that the BGEPA's Indian exception creates a denominational or racial preference. Supreme Court precedent makes clear that this Indian exception results in a political classification, which requires the government merely to show a rational relationship between the Act and the federal government's unique obligation to preserve Native American culture. The Act easily survives rational basis review. As a result, we AFFIRM the district court's denial of Wilgus's motion to dismiss the indictment.

## BACKGROUND

On June 5, 1998, Utah Highway Patrol Officer Gordon Mortenson stopped a speeding 1997 Mazda pick-up truck.[1] Inside the cab of the truck were three men: the driver, Kevin Mieswinkel; his adult passenger, Defendant-Appellant Samuel Ray Wilgus, Jr.; and Wilgus's teenage son. Officer Mortenson arrested Mieswinkel for driving on a suspended license. Incident to the arrest, Officer Mortenson searched the truck, including a wooden box which was in the open bed of the pick-up.[2] The box contained 137 feathers from bald and golden eagles. Wilgus admits he knowingly possessed the feathers.

Four days later, on June 9, 1998, Ed Liese, an investigator with the Utah Division of Wildlife Resources, called at Wilgus's home in Layton, Utah. There, Linda Wilgus, Appellant's wife, produced four more feathers from bald and golden eagles. Wilgus admits he knowingly possessed these feathers as well. The district court found that Wilgus "did not have a permit from the U.S. Fish & Wildlife Service authorizing possession of any of the eagle feathers from either incident."

---

[1]None of the district court's findings of fact are challenged on appeal.

[2]Wilgus does not challenge the lawfulness of the search.

- 3 -

Wilgus is not a member of any federally recognized Indian tribe, and he cannot establish that he has any Native American Indian ancestry.[3] It is undisputed that Wilgus is a bona fide adherent of a Native American religion and that possession of eagle feathers are central to his beliefs and practices.

As a result of his knowing possession of the feathers, Wilgus was charged with possessing 141 bald and golden eagle feathers without a permit in violation of the Act. Wilgus filed a motion to dismiss on the ground that the Act violates the religion clauses of the First Amendment and the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb to 2000bb-4. The court denied the motion. It held that RFRA had been overruled by City of Boerne v. Flores, 521 U.S. 507, 519 (1997). The court further held that the BGEPA was a neutral, generally applicable law which fell within the safe-harbor created by Employment Division v. Smith, 494 U.S. 872 (1990). Finally, the court adopted the reasoning of Rupert v. U.S. Fish and Wildlife Serv., 957 F.2d 32, 33 (1992), which held that the BGEPA does not violate the Establishment Clause.

Wilgus entered a conditional guilty plea, permitting him to challenge the district court's denial of his motion to dismiss the indictment. The court

[3]Wilgus contends he is an adopted member of the Paiute Indian Tribe of Utah because he was "adopted" in a traditional Indian ceremony by a Paiute family. Yet, he concedes that Paiute tribal law does not recognize the adoption of non-Indians as members of the tribe.

sentenced him to one year of probation and one hundred hours of community service.

## DISCUSSION

A. Jurisdiction and Standard of Review

The district court had original jurisdiction under 18 U.S.C. § 3231. We exercise jurisdiction pursuant to 28 U.S.C. § 1291.

We review de novo questions of constitutional law. See Andersen v. McCotter, 205 F.3d 1214, 1217 (10th Cir. 2000). Since the district court's factual findings are not appealed, we accept them as undisputed. See Hein v. TechAmerica Group, Inc., 17 F.3d 1278, 1279 (10th Cir. 1994).

The government argues that Wilgus lacks standing to challenging the permitting process. See Answer Brief at 6-7 (citing United States v. Hugs, 109 F.3d 1375, 1378 (9th Cir. 1997)). We express no opinion as to the merits of this contention because it is irrelevant. Wilgus is not challenging the "operation of the underlying administrative scheme" but rather "the facial validity of the BGEPA and its regulations." Id. It is clear he has standing to challenge the constitutionality of the statute under which he was convicted.

B. Free Exercise

- 5 -

As noted above, at the district court Wilgus challenged the Act on the grounds that it violates the Free Exercise Clause and RFRA. On appeal, however, Wilgus raises only the free exercise claim. Since he does not raise RFRA on appeal, we do not address it. See Fed. R. App. P. 28(a) (requiring appellants to raise and argue the issues on which they seek review); State Farm Fire & Cas. Co. v. Mhoon, 31 F.3d 979, 984 n.7 (10th Cir. 1994) (holding that failure to raise an issue in the opening brief waives the issue).

It might be contended, however, that RFRA applies in every free exercise case, even when it is not asserted on appeal. We begin by considering this threshold issue.

1. Whether RFRA Applies

Courts are split on the question of whether RFRA applies when a party does not raise it. The following cases indicate RFRA applies in all free exercise cases, even when not raised: Diaz v. Collins, 114 F.3d 69, 71 & n.7 (5th Cir. 1997); Jones-Bey v. Wright, 944 F. Supp. 723, 736 n.6 (N.D. Ind. 1996); Abdul-Akbar v. Dep't of Corr., 910 F. Supp. 986, 1007-08 (D. Del. 1995); Muslim v. Frame, 897 F. Supp. 215, 216-17 (E.D. Pa. 1995); Winters v. State of Iowa, 549 N.W. 2d 819, 820 (Iowa 1996); Geraci v. Eckankar, 526 N.W. 2d 391, 401 (Minn. Ct.

App. 1995).[4]  In contrast, the following cases found RFRA did <u>not</u> apply because

neither party had raised it: <u>First Assembly of God of Naples, Florida, Inc. v.

Collier County, Florida</u>, 27 F.3d 526, 526 (11th Cir. 1994); <u>Brown-El v. Harris</u>,

26 F.3d 68, 69 (8th Cir. 1994); <u>Shaheed v. Winston</u>, 885 F. Supp. 861, 866 n.1

(E.D. Va. 1995); <u>Levinson-Roth v. Parries</u>, 872 F. Supp. 1439, 1451 & n.7 (D.

Md. 1995).[5]

The text of RFRA is also ambiguous.  The "Purposes" section of the statute

reads:

> The purposes of this chapter are to restore the compelling interest
> test as set forth in <u>Sherbert v. Verner</u>, 374 U.S. 398 (1963), and
> <u>Wisconsin v. Yoder</u>, 406 U.S. 205 (1972), and to guarantee its
> application in <u>all</u> cases where free exercise of religion is
> substantially burdened; and to provide a claim or defense to persons
> whose religious exercise is substantially burdened by government.

42 U.S.C. § 2000bb(b)(1) & (2) (emphasis added).  A substantive portion of

RFRA, however, provides, "A person whose religious exercise has been burdened

in violation of this section <u>may assert</u> that violation as a claim or defense in a

judicial proceeding." 42 U.S.C. § 2000bb-1(c) (emphasis added).  It is undisputed

---

[4]<u>See also</u> <u>Morris v. Debruyn</u>, No. 3:95-CV–227RP, 1996 WL 441860, at *6 (N.D. Ind. July 15, 1996) (unpublished opinion). <u>Cf.</u> <u>Woods v. Evatt</u>, 876 F. Supp. 756, 762 (D. S.C. 1995) (noting that plaintiff had amended his complaint to add a RFRA claim, but also stating "RFRA is <u>both</u> a new cause of action and a revised standard of review for claims . . . involv[ing] a denial of constitutionally guaranteed religious freedom.").

[5]<u>See also</u> <u>Holterman v. Helling</u>, No. 94-3113, 1995 WL 702300, at *1 (8th Cir. Nov. 30, 1995) (unpublished opinion).

that the BGEPA substantially burdens Wilgus's exercise of his religious beliefs, but he does not assert RFRA as a defense on appeal.

In the face of this ambiguity, we decline to deviate from the rule that an appellant must raise the issues upon which he seeks this court's review, and, when doing so, he must identify the particular law or right under which a claim or defense arises. See Hernandez v. Starbuck, 69 F.3d 1089, 1093 (10th Cir. 1995) ("A court of appeals is not required to manufacture an appellant's argument on appeal when [he] has failed in [his] burden to draw our attention to the error below.") (quotation marks omitted). To decide otherwise would be to disregard the Federal Rules of Appellate Procedure and would require this court to comb the record for meritorious claims or defenses not raised by the parties, fundamentally altering the role of the appellate court in our adversarial system.

While the existence of RFRA may be so well-known that some may believe it would only minimally burden courts to invoke it sua sponte whenever a party asserts a free exercise violation, to start down this road is to invite parties to argue that a prior court erred by not recasting their claim under some other, more favorable statute or case or by not raising sua sponte a meritorious issue abandoned by appellant. We believe such a road will consume precious time and transform courts into advocates. See Mitchell v. City of Moore, 218 F.3d 1190, 1199 (10th Cir. 2000).

Had Congress desired to direct courts to apply RFRA in all free exercise cases, regardless of whether the parties had raised it, it would have written RFRA unambiguously to achieve that purpose. Since it did not, and since Wilgus did not raise such a defense on appeal, we do not express any opinion on whether the BGEPA violates the RFRA standard. Instead, we limit our analysis to Wilgus's challenge: whether the Act violates the Free Exercise Clause.[6]

2. Free Exercise Clause Analysis

Employment Division v. Smith, 494 U.S. 872, 878-79 (1990), held that neutral, generally applicable laws do not violate the Free Exercise Clause, even if they incidentally burden religious practice. See also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531 (1993) ("[A] law that is neutral and of general applicability need not be justified by a compelling

---

[6]Werner v. McCotter, 49 F.3d 1476 (10th Cir. 1995), is not to the contrary. In Werner, this court wrote, "The recent passage of [RFRA] legislatively overturned a number of recent Supreme Court decisions" by reinstating the compelling state interest test in "all cases where free exercise of religion is substantially burdened." Id. at 1479 (emphasis in original) (quoting 42 U.S.C. § 2000BB(b)(1)). Two years later, however, the Supreme Court, in City of Boerne v. Flores, 521 U.S. 507, 519 (1997), held that Congress had no power "to determine what constitutes a constitutional violation." Thus, to the extent that Werner is read to hold that RFRA modified the constitutional standard under the Free Exercise Clause, Boerne erased Werner's underpinnings, and this court is no longer bound by it. To the extent that Werner is read solely to advance a statutory right, our previous (and therefore controlling) Tenth Circuit authority makes it clear that such a right must be asserted on appeal by the appellant or else is waived. See State Farm Fire & Cas. Co. v. Mhoon, 31 F.3d 979, 984 n.7 (10th Cir. 1994).

governmental interest even if the law has the incidental effect of burdening a particular religious practice.").  We hold that the BGEPA is a neutral, generally applicable law and, as such, it falls within the Smith safe-harbor.

The First Amendment provides, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I.  The textual difference between the Establishment Clause and the Free Exercise Clauses bears upon how they ought to be interpreted. See School Dist. of Abington Township v. Schempp, 374 U.S. 203, 222-23 (1963).  The Framers wrote the Establishment Clause broadly: it prohibits laws "respecting an establishment of religion."  In contrast, the Free Exercise Clause is written much more narrowly: laws "prohibiting the free exercise" of religion are forbidden. "Respecting an establishment" implies that not only the act of establishing a religion is off-limits to government, but likewise are any steps respecting (i.e., relating to or concerning)[7] such establishment.  The Free Exercise Clause, on the other hand, only proscribes laws "prohibiting" the free exercise of religion.  The difference is more than just the word "respecting."  It is also the difference between "establishing" and "prohibiting."  This textual difference between the two clauses forms the basis for our interpretation of "neutrality" and "general applicability" under Smith.

_____

[7]See Wester's Third New International Dictionary 1934 (1986).

- 10 -

The Supreme Court in Hialeah noted, "Neutrality and general applicability are interrelated, and . . . failure to satisfy one requirement is a likely indication that the other has not been satisfied." Id. at 531. While commentators agree that the Supreme Court has not defined precisely the meaning of these terms, it seems clear that "neutrality" is a subjective inquiry into the purpose or object of a law, while "general applicability" is an objective inquiry dealing with the scope of a statute. See, e.g., 5 Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law: Substance and Procedure § 21.8, at 133 n.20 (3d ed. 1999) ("[T]he inquiry into 'religious neutrality' would involve an inquiry into legislative motive or purpose, whereas an inquiry into general applicability might focus only on the scope of the statute."); David Bogen, Generally Applicable Laws and the First Amendment, 26 S.W. U. L. Rev. 201, 202 (1997) ("Justice Kennedy's opinion for the Court in Lukumi referred to a 'requirement' of neutrality and general applicability. . . . Neutrality is determined by the object of the law. General applicability involves categories of selection. Any law affecting religion must use the proper means ('general applicability') to achieve a proper end ('neutrality').").

a. Neutrality

The Supreme Court in Hialeah explained at some length what "neutrality" means in the free exercise context post-Smith, stating, "if the object of a law is to

infringe upon or restrict practices because of their religious motivation, the law is not neutral." Hialeah, 508 U.S. at 533. Smith-neutrality would forbid "laws whose 'object' is to prohibit religious exercise," whereas it would not forbid "[laws] that prohibit religious exercise as an 'incidental effect.'" See id. at 562 (Souter, J., concurring). See generally, Douglas Laycock, Formal, Substantive and Disaggregated Neutrality Toward Religion, 39 DePaul L. Rev. 993 (1990). However, "The Free Exercise Clause protects against governmental hostility which is masked, as well as overt." Hialeah, 508 U.S. at 534.

The BGEPA is neutral. Its purpose is, first and foremost, to protect eagles – this is what it is designed to do. That it contains exceptions, "for scientific or exhibition purposes of public museums, scientific societies, and zoological parks, or for the religious purposes of Indian tribes," 16 U.S.C. § 668a, does not change the Act's purpose.[8]

Even if one chooses to examine the Act's Indian exception separately, an action I am not convinced is justified in this context, it does not violate this principle of neutrality. This is because the object or purpose of the Indian exception is to permit members of federally recognized Indian tribes to use eagle

_____

[8]The exceptions under the BGEPA are distinguishable from those in Hialeah. In the BGEPA, the exceptions are circumscribed such that they do not call into question the overriding purpose of the Act. In the Hialeah situation, the "pattern of exemptions parallel[ed] the pattern of narrow prohibitions[, e]ach contribut[ing] to the [religious] gerrymander." 508 U.S. at 537.

feathers in their worship; the object of the exceptions is <u>not</u> to prohibit non-Indians from so using them. There is a fundamental difference between laws whose purpose is to permit or accommodate religious practice and laws whose purpose is to prohibit or burden such practice. The only prohibitory purpose is in the general language of the BGEPA prohibiting the possession or use of eagle feathers, and that prohibition is certainly neutral as to religion. The exception for Indian religious use may not be neutral but it is not prohibitory and nothing in that exception restricts Wilgus's free exercise of religion.

Two examples – one mundane and one legal – illustrate this dual difference between purpose and effect, on the one hand, and permitting and prohibiting, on the other. First, my purpose when I permit my daughter to drive my car is to permit her to drive; my purpose is not, absent other evidence, to prohibit my son from driving the same car at the same time, even if that is the practical effect. Second, and similarly, in <u>Peyote Way Church of God, Inc. v. Thornburgh</u>, 922 F.2d 1210 (5th Cir. 1991), when the federal government carved out an exception to the general ban on possession of peyote, which permitted members of the Native American Church of North America (NAC) to possess and use peyote for bona fide religious ceremonies, the exception's <u>object</u> was <u>not</u> to prohibit the Peyote Way Church of God (or anyone else) from using peyote. <u>See</u> <u>id.</u> at 1212. Rather, the <u>object</u> of the exception was to permit a church, which the

government knew used peyote in its religious ceremonies, to use the plant. The Fifth Circuit "accept[ed] the government's explanation that [granting permission only to the NAC] was done because the NAC is the only tribal Native American organization of which the government is aware that uses peyote in bona fide religious ceremonies." Id. at 1217. The purpose was accommodation; the purpose was not discrimination.

This is not to say that making exceptions for certain religious groups but not for others can never support a conclusion that the covert purpose of a legislative scheme is to discriminate. Indeed, the Supreme Court in Hialeah found that the numerous exceptions to the City of Hialeah's general prohibition against the ritual slaughter of animals – e.g., for kosher slaughter – were evidence that "[t]he design of these laws accomplishes . . . a 'religious gerrymander,' an impermissible attempt to target [the Church of Lukumi Babalu Aye] and [its] religious practices." Id. at 535; see also id. at 537 ("A pattern of exemptions parallels the pattern of narrow prohibitions. Each contributes to the gerrymander."). The Supreme Court was careful to point out, however, that while "the effect of a law in its real operation is strong evidence of its object, . . . adverse impact will not always lead to a finding of impermissible targeting." Id. at 535. Since the object of the exemption in the BGEPA is to accommodate the religious exercise of members of federally recognized Indian tribes, and there is

- 14 -

no evidence that the object or purpose of the BGEPA is to burden anyone's religious practice, we find the Act, and its exceptions, neutral.

Some may object that this defines "neutrality" post-Smith too narrowly. It could be argued that the common usage of the term[9] and the Supreme Court's explication of it in Hialeah[10] dictate that neutrality be understood to include burdening or benefitting religious conduct. That is, under this interpretation, a "neutral law" is one whose object is to neither disfavor nor favor religious practice.

We do not agree with this broader interpretation of neutrality for several reasons. First, it ignores the well-established principle that words must be interpreted in their constitutional context. See, e.g., Nixon v. United States, 506 U.S. 224, 229-33 (1993) (interpreting the words "sole" and "try" of the Impeachment Clause of Art. I, §3, cl.6, by carefully examining the constitutional context); Williams v. Florida, 399 U.S. 78, 113 (1970) (Black, J., concurring in part and dissenting in part) ("It is only through sensitive attention to the specific

---

[9]See, e.g., Black's Law Dictionary 1042 (6th ed. 1990) (defining "neutral" as "indifferent; unbiased; impartial; not engaged on either side; not taking an active part with either of the contending sides").

[10]See Hialeah, 508 U.S. at 532 (citing Establishment Clause cases in which the State was accused of benefitting religion in order to contrast neutrality with endorsement, e.g., Board of Educ. of Westside Community Sch. (Dist. 66) v. Mergens, 496 U.S. 226, 248 (1990) (plurality opinion) (stating a law is not neutral if it "confer[s] any imprimatur of state approval on religious sects or practices.") (quoting Widmar v. Vincent, 454 U.S. 263, 274 (1981))).

words, the context in which they are used, and the history surrounding the adoption of those provisions that the true meaning of the Constitution can be discerned."). The First Amendment reads, "Congress shall make no law respecting an establishment of religion, or <u>prohibiting</u> the free exercise thereof." U.S. Const. amend. I (emphasis added). As discussed briefly above, courts have long acknowledged that the textual difference between the two religion clauses demonstrates their different functions. <u>See</u>, <u>e.g.</u>, <u>Engel v. Vitale</u>, 370 U.S. 421, 430 (1962) ("Although [the religion] clauses may in certain instances overlap, they forbid two quite different kinds of governmental encroachment upon religious freedom."); <u>School Dist. of Abington Township v. Schempp</u>, 374 U.S. 203, 222-23 (1963) (discussing the "apparent distinction" between the two clauses); <u>Roberts v. Madigan</u>, 702 F.Supp. 1505, 1511 (D. Colo. 1989) ("Each clause serves a different purpose: the goal of the Free Exercise Clause is to keep religious faith voluntary--free from government coercion--while the goal of the Establishment Clause is to prevent excessive government involvement in religion."). Broadly stated, neutrality for purposes of the Free Exercise Clause is concerned only with <u>burdens</u> on religious conduct, while neutrality for purposes of Establishment Clause analysis is concerned with both <u>burdens and benefits</u> to religion because the Free Exercise Clause is modified by the word "prohibiting" whereas the Establishment Clause uses the much more general word "respecting."

- 16 -

Understood in this context, "neutrality" for the Free Exercise Clause is best used in the narrow sense, such that laws whose object is not "to infringe upon or restrict practices because of their religious motivation," Hialeah, 508 U.S. at 533, are "neutral" under this clause.

Second, a close reading of Hialeah reveals that, although the majority in that case cited Establishment Clause cases when discussing "neutrality," it did not intend to import the Establishment Clause's jurisprudence into the free exercise context. The most telling evidence of this are the words of Hialeah itself immediately after its string-cite of Establishment Clause cases:

> These cases, however, for the most part have addressed governmental efforts to benefit religion or particular religions, and so have dealt with a question different, at least in formulation and emphasis, from the issue here. Petitioners allege an attempt to disfavor their religion because of the religious ceremonies it commands, and the Free Exercise Clause is dispositive in our analysis.

508 U.S. at 532 (emphasis added).

Our research uncovered four circuit courts of appeals employing the narrow reading of "neutral" in the free exercise context (limited to burdening the exercise of religion) and none using the broader reading (burdening and benefitting religion). See Peyote Way Church of God v. Thornburgh, 922 F.2d 1210, 1213 (5th Cir. 1991) ("The Smith majority held that Oregon's statute criminalizing peyote possession withstands challenge under the free exercise

clause because it . . . does not have as its purpose the <u>proscription</u> of religious conduct.") (emphasis added); <u>Mount Elliott Cemetery Ass'n v. City of Troy</u>, 171 F.3d 398, 405 (6th Cir. 1999) ("A law is not neutral if the object of the law, whether overt or hidden, is to <u>infringe</u> upon or <u>restrict</u> practices because of their religious motivation.") (emphasis added); <u>United States v. Indianapolis Baptist Temple</u>, 224 F.3d 627, 629 (7th Cir. 2000) ("[T]here is no indication that they were enacted for the purpose of <u>burdening</u> religious practices.") (emphasis added); <u>KDM ex rel. WJM v. Reedsport School Dist.</u>, 196 F.3d 1046, 1050 (9th Cir. 1999) (finding a law neutral because "as applied here it does not have the object or purpose of <u>suppression</u> of religion or religious conduct") (emphasis added) (citation and alterations omitted).

Consequently, given the constitutional context, statements from <u>Hialeah</u>, and sister-circuit decisions, we find that post-<u>Smith</u> neutrality for free exercise analysis should be viewed narrowly and limited to an assessment of whether a law's object is to burden religious conduct.[11]  Since the purpose of the BGEPA's

[11]This interpretation of <u>Smith</u> neutrality does not immunize from challenge government action that <u>benefits</u> one group's religious conduct.  Such challenges are properly brought under either the Establishment Clause or the Equal Protection Clause.  <u>Accord</u> <u>Thornburgh</u>, 922 F.2d at 1220 (Clark, C.J., dissenting) (analyzing Indian exemption for peyote possession under establishment and equal protection principles, but agreeing with the majority that law falls within <u>Smith</u> safe-harbor); <u>Rupert v. U.S. Fish and Wildlife Serv.</u>, 957 F.2d 32, 34 (1992) ("Although Mr. Rupert's claim is rooted in the Establishment Clause, '[n]eutrality
(continued...)

exceptions is to benefit members of federally recognized Indian tribes (and other non-religious groups), and not to burden anyone, the Act is neutral.

Even if we accepted a broad reading of neutrality for free exercise analysis to include both burdens and benefits, however, the result would not change because the BGEPA is "neutral" even under this interpretation. First, as mentioned above, the purpose of the Act is to protect eagles, despite the narrow exception. Second, even if focused on the exception, we conclude it is neutral, under the broad reading, because the purpose of the Indian exception is not to favor or disfavor religion or a particular religion but to benefit members of federally recognized Indian tribes so that their unique religion and culture may survive. This purpose – favoring members of federally recognized Indian tribes – is political[12] in nature (not religious or racial[13]) and holds a unique and protected

[11](...continued)
in its application requires an equal protection mode of analysis.'") (quoting Walz, 397 U.S. at 696); Olsen v. Drug Enforcement Admin, 878 F.2d 1458, 1463 n.5 (D.C. Cir. 1989) ("[I]n cases of this character, establishment clause and equal protection analyses converge."). In addition, as described above, in the free exercise context preferential treatment for some but not others is evidence (but only evidence) of a covert, non-neutral law.

[12]The Supreme Court has explicitly held that beneficial treatment for members of federally recognized Indian tribes is political in nature and permissible. In Morton v. Mancari, 417 U.S. 535 (1974), for instance, the Supreme Court upheld preferential employment treatment for Indians, noting "The preference is not directed towards a 'racial' group consisting of 'Indians'; instead, it applies only to members of 'federally recognized' tribes. This operates to exclude many individuals who are racially to be classified as 'Indians.' In this

(continued...)

place under our laws.  The Supreme Court "has repeatedly held that the peculiar

semi-sovereign and constitutionally recognized status of Indians justifies special

treatment on their behalf when rationally related to the Government's 'unique

obligation towards the Indians.'" Washington v. Washington State Commercial

Passenger Fishing Vessel Ass'n, 443 U.S. 658, 673 n.20 (1979) (quoting Morton

v. Mancari, 417 U.S. 535, 555 (1974)).  As a rationale for this special

constitutional treatment of Indians, the Court wrote:

> Literally every piece of legislation dealing with Indian tribes and
> reservations . . . single out for special treatment a constituency of
> tribal Indians living on or near reservations.  If these laws, derived
> from historical relationships and explicitly designed to help only
> Indians, were deemed invidious racial discrimination, an entire Title
> of the United States Code (25 U.S.C.) would be effectively erased
> and the solemn commitment of the Government toward the Indians
> would be jeopardized.

---

[12](...continued)
sense, the preference is political rather than racial in nature." Id. at 554 n.24.

The Fifth Circuit applied this principle to hold that an exception permitting members of the Native American Church to use peyote was a political classification. See Thornburgh, 922 F.2d at 1216 (holding that "NAC membership is limited to Native American members of federally recognized tribes who have at least 25% Native American ancestry, and therefore represents a political classification") (citing Morton v. Mancari, 417 U.S. 535, 555 (1974)).

[13]The Supreme Court has explained, "The decisions of this Court leave no doubt that federal legislation with respect to Indian tribes, although relating to Indians as such, is not based upon impermissible racial classifications. . . . Legislation with respect to these 'unique aggregations' has repeatedly been sustained by this Court against claims of unlawful racial discrimination." United States v. Antelope, 430 U.S. 641, 645 (1977).

Morton, 417 U.S. at 552. The Supreme Court further justifies this special status by noting that the Indian Commerce Clause "expressly singl[es] out Indian tribes as subjects of legislation," United States v. Antelope, 430 U.S. 641, 645 (1977), and that Indian tribes have historically been recognized by the federal government as "unique aggregations" and "separate peoples." Id. (citation omitted). Indeed, the American Indian Religious Freedom Act dictates that "it shall be the policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, . . . including but not limited to . . . the freedom to worship through ceremonials and traditional rites." 42 U.S.C. § 1996.[14]

Consequently, since the purpose of the exception is to benefit a political group, not to benefit religion or a particular religion, it is neutral even under the broad definition.

b. General Applicability

Furthermore, the Act satisfies the objective half of the Smith analysis: "general applicability." The majority in Hialeah wrote that a law violates this requirement when "a legislature decides that the governmental interests it seeks to

---

[14]While we acknowledge that the AIRFA does not create "any judicially enforceable individual rights," Lyng v. Northwest Indian Cemetery Protection Assoc., 485 U.S. 439, 455 (1988), it is further evidence of the unique status of Indians under our laws.

advance are worthy of being pursued only against conduct with a religious motivation." 508 U.S. at 542-43; accord Mount Elliott Cemetery Ass'n v. City of Troy, 171 F.3d 398, 405 (6th Cir. 1999) (defining "general applicability" using the same quotation from Hialeah). The Court explained that "the government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief." Hialeah, 508 U.S. at 543. It summarized its "general applicability" analysis by noting that the "precise evil" this requirement is designed to prevent are laws "that society is prepared to impose upon [religious minorities] but not upon itself." Id. at 545 (quoting Florida Star v. B.J.F., 491 U.S. 524, 542 (1989) (Scalia, J., concurring)).[15]

Moreover, cases from the Supreme Court and this court demonstrate that "general applicability" does not mean universal applicability. Rather, "general" should be given its customary meaning of "widespread," "predominant," or "prevalent." See American Heritage Dictionary 755 (3rd ed. 1992) (defining "general" as "being usually the case; true or applicable in most instances but not all"). "General" admits the possibility of some minor exceptions or deviations.

_____

[15]We acknowledge that the Hialeah majority also wrote, "In this case we need not define with precision the standard used to evaluate whether a prohibition is of general application, for these ordinances fall well below the minimum standard necessary to protect First Amendment rights." Id. at 543. Similarly, we need not scrutinize the term because we believe the BGEPA falls well within its contours.

For instance, the majority began <u>Smith</u> by noting that the Oregon law making peyote an illegal controlled substance contained an exception for peyote prescribed by a medical practitioner. <u>See</u> <u>Employment Div. v. Smith</u>, 494 U.S. 872, 874 (1990). That did not stop that law from being of general applicability. When applying <u>Smith</u> in this circuit, we found a school board policy forbidding part-time students from attending public schools, but providing exceptions for fifth-year seniors and special-education students, to be "generally applicable," despite these exceptions. <u>See</u> <u>Swanson v. Guthrie Indep. Sch. Dist. No. I-L</u>, 135 F.3d 694, 696-98 (10th Cir. 1998).

The BGEPA fits squarely within this definition of "generally applicable." Its proscription against possessing eagle feathers applies broadly to almost all of society. The exceptions are sufficiently limited in articulation and practical effect to permit us to conclude that there is no free exercise violation. The Act certainly is not a prohibition that society imposes upon a small minority but not upon itself. To the contrary, the Act forbids almost all segments of society from possessing eagles or their parts.[16]

---

[16]The BGEPA does not fall within the so-called "<u>Sherbert</u> exception" either. The <u>Smith</u> majority acknowledged "the proposition that where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason." 494 U.S. at 884. Initially, we note that it appears, post-<u>Smith,</u> that this exception is limited to cases dealing with unemployment compensation. <u>See</u> <u>id.</u> at 883-84. More importantly,

(continued...)

In conclusion, since the Act is both "neutral" and "generally applicable," it falls within the Smith safe-harbor. As such, it does not violate the Free Exercise Clause despite its incidental effect on Wilgus's religious practice.

C. Establishment Clause

Wilgus also objects that the BGEPA violates the Establishment Clause. Specifically, he alleges, citing Larson v. Valente, 456 U.S. 228, 247 (1982) (stating that laws that grant denominational preferences are generally subject to strict scrutiny), that the government creates impermissible denominational and racial preferences by permitting the possession of eagle feathers for members of federally recognized Indian tribes but forbidding them for him.

The Supreme Court has "repeatedly emphasized [that] Congress' authority over Indian matters is extraordinarily broad." Santa Clara Pueblo v. Martinez, 436 U.S. 49, 72 (1978). Moreover, as we explained at length above, see supra at 19-21, the Act's exception for federally recognized Indian tribes is political, not

---

[16](...continued)
however, the Smith Court took time to clarify that this exception applied only when the government has created a "mechanism for individualized exemptions" under which the government would consider "the particular circumstances behind an applicant's unemployment." Id. at 884. In addition to not having anything to do with unemployment compensation, the BGEPA, in contrast, does not establish a mechanism by which the particular circumstances of each individual is considered, without extending this system to cases of religious hardship. Rather, the Act affords beneficial treatment to one political class – members of federally recognized Indian tribes – while denying it to other classes.

religious or racial, in nature. Cf. United States v. Antelope, 430 U.S. 641, 645 (1977) (legislation pertaining to Indian tribes as predicated upon political rather than racial classifications). Likewise, "[t]he unique guardian-ward relationship between the federal government and Native American tribes precludes the degree of separation of church and state ordinarily required by the First Amendment." Peyote Way Church of God, Inc. v. Thornburgh, 922 F.2d 1210, 1217 (5th Cir. 1991). Tribal religion is inseparable from its culture and "tribes remain quasi-sovereign nations which, by government structure, culture, and source of sovereignty are in many ways foreign to the constitutional institutions of the federal and state governments." Santa Clara Pueblo, 436 U.S. at 71 (emphasis added). As such, "[t]he federal government cannot at once fulfill its constitutional role as protector of tribal Native Americans and apply conventional separatist understandings of the establishment clause to that same relationship." Thornburgh, 922 F.2d at 1217.

Accordingly, we find the Act bestows special treatment on federally recognized Indian tribes, but that we review that treatment only to see if it is rationally related to the government's extraordinary duty to Indians. See Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 673 n.20 (1979) (explaining that the Court "has repeatedly held that the peculiar semi-sovereign and constitutionally recognized status of Indians

justifies special treatment on their behalf when rationally related to the Government's unique obligation toward the Indians"). We have no trouble concluding that allowing members of Indian tribes to possess eagle feathers for the purpose of worshiping according to their Native American traditions is rationally related to the government's unique obligation to preserve Indian tribes' heritage and culture. Therefore, we AFFIRM the district court's dismissal of Wilgus's Establishment Clause challenge.

## CONCLUSION

We hold the Bald and Golden Eagle Protection Act does not violate the religion clauses of the United States Constitution. As such, we AFFIRM Wilgus's conviction.

No. 00-4015, United States v. Wilgus

BALDOCK, Circuit Judge, dissenting.

Applying Employment Div. v. Smith, 494 U.S. 872 (1990), this Court upholds

Defendant's criminal conviction under the Bald and Golden Eagle Protection Act

(BGEPA), 16 U.S.C. § 688(a), because, according to the Court, the BGEPA is a neutral,

generally applicable law that comports with First Amendment demands.  In doing so,

the Court, in my opinion, unjustifiably ignores the heightened legislative standard set

forth in the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb thru

2000bb-4–a standard against which Congress undoubtedly intended courts to measure

laws such as the BGEPA.  Accordingly, I dissent.

I.

The Free Exercise Clause of the First Amendment proscribes law prohibiting

the free exercise of religion.  In 1963, the Supreme Court set forth a compelling

interest test for free exercise challenges to government action.  Sherbert v. Verner,

374 U.S. 398 (1963).  In Sherbert and its progeny, the Supreme Court established that

only a compelling governmental interest would justify government action burdening

a person's religious practice regardless of whether such action specifically targeted

religion.  See id. at 403.  In 1980, however, the Supreme Court altered course and held

that neutral laws of general applicability do not violate the Free Exercise Clause, even

when such laws burden the free exercise of religion.  Employment Div., 494 U.S. at 879.

In 1993, Congress, through RFRA, sought to legislatively abolish <u>Smith</u>'s neutrality test in favor of <u>Sherbert</u>'s compelling interest test. RFRA very plainly and unambiguously defines its purpose as:

> (1) to restore the compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398 (1963) . . . and to <u>guarantee its application in all cases where free exercise of religion is substantially burdened</u>; and

> (2) to provide a claim or defense to persons whose religious exercise is substantially burdened by government.

42 U.S.C. § 2000bb(b) (emphasis added). To that end, RFRA states: "Government <u>shall not</u> substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section." <u>Id.</u> § 2000bb-1(a) (emphasis added). Subsection (b) provides that government action may substantially burden a person's exercise of religion if such action (1) furthers "a compelling governmental interest" and (2) is "the least restrictive means" of furthering that interest. <u>Id.</u> § 2000bb-1(b). RFRA's sweeping coverage is confirmed by § 2000bb-3(a), which provides that RFRA "<u>applies to all</u> Federal and State law and the implementation of that law, whether statutory or otherwise, and whether adopted before or after [RFRA's effective date]. <u>Id.</u> § 2000bb-3(a) (emphasis added).[1]

---

[1] Of course, Congress cannot legislate a constitutional standard. Thus, in <u>City of Boerne v. Flores</u>, 521 U.S. 507 (1997), the Supreme Court held RFRA unconstitutional as applied to the States because Congress lacked power under § 5 of the Fourteenth Amendment to impose the compelling interest test on the States. A contrary ruling would have infringed upon the separation of powers by effectively allowing Congress

(continued...)

Given RFRA's plain language and tone, I cannot agree with the Court's conclusion that the text of RFRA is ambiguous as to whether Congress intended RFRA to apply "<u>in all cases where free exercise of religion is substantially burdened</u>."  <u>Id.</u> § 2000bb(b)(1) (emphasis added).  <u>See</u>, <u>e.g.</u>, <u>Diaz v. Collins</u>, 114 F.3d 69, 71 & n.7 (5th Cir. 1997) (free exercise challenges "must be reviewed" under RFRA); <u>Jones-Bey v. Wright</u>, 944 F. Supp. 723, 736 (N.D. Ind. 1996) ("RFRA . . . applies to civil rights actions involving alleged burdens on free exercise of religion, even if the parties do not raise the issue in their pleadings."); <u>Muslim v. Frame</u>, 897 F. Supp. 215, 216 (E.D. Pa. 1995) ("RFRA is the law regardless of whether the parties mention it.").[2]  The remote phrase "may assert" contained in § 2000bb-1(c), on which this Court relies to support its claim of ambiguity,

---

(...continued)
to determine what constitutes a constitutional violation.  <u>Id.</u> at 519, 536.  A panel of this court, however, subsequently held RFRA constitutional as applied to the Federal Government because "the separation of powers concerns expressed in <u>Flores</u> do not render RFRA unconstitutional as applied to the federal government."  <u>Kikumura v. Hurley</u>, 242 F.3d 950, 959 (10th Cir. 2001).  We explained:  "That the RFRA standard for suits against the federal government is more protective than what the Constitution requires does not make the statute unconstitutional:  Congress has often provided statutory protection of individual liberties that exceed the Supreme Court's interpretation of constitutional protection."  <u>Id.</u> at 959 (internal quotations omitted).  Bound by <u>Kikumura</u>, I proceed under the premise that RFRA is constitutional as applied to the Federal Government and provides a statutory standard higher than the constitutional floor established in <u>Smith</u>.  Much may be said, however, for the proposition that RFRA constitutes an outright attempt by Congress to impose a constitutional standard across the board and thus is unconstitutional in its entirety.

[2]  <u>But see</u> <u>First Assembly of God of Naples, Fla., Inc. v. Collier County, Fla.</u>, 27 F.3d 526, 526 (11th Cir. 1994) (declining to discuss RFRA where neither party raised it); <u>Brown-El v. Harris</u>, 26 F.3d 68, 69 (8th Cir. 1994) (same); <u>Shaheed v. Winston</u>, 885 F. Supp. 861, 867 (E.D. Va. 1995) (same).

Court's Op. at 8, hardly convinces me otherwise. Because "it is undisputed that the BGEPA substantially burdens Wilgus' exercise of his religious beliefs," Court's Op. at 8, RFRA should apply.[3]

Even assuming for the moment that the Court is correct in holding that a defendant must specifically raise RFRA as an affirmative defense to government action or waive it, we should still review for plain error the district court's conclusion that the Supreme Court held RFRA unconstitutional.[4] "In exceptional circumstances, <u>especially in criminal cases,</u> appellate courts, in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity, or public reputation of judicial proceedings." <u>United States v. Atkinson,</u> 297 U.S. 157, 160 (1936) (emphasis added). Further, Fed. R. Crim. P. 52(b) specifically provides that plain errors or defects affecting substantial rights may be noticed although they are not brought to the attention of the court. <u>See</u> <u>DeRoo v. United States,</u> 223 F.3d 919, 926 (8th Cir. 2000) ("[A]ppellate courts can examine a critical issue affecting substantial rights sua sponte in criminal cases under Federal Rule of Criminal Procedure 52(b)."); <u>United States v. Jackson,</u> 32 F.3d 1101,

---

[3] The Court's refusal to acknowledge RFRA's clear mandate ensures our receipt of Defendant's § 2255 petition claiming ineffective assistance of counsel for failure to raise RFRA on appeal–undoubtedly Defendant's best challenge to his conviction. At that point, the Court will have no choice but to measure the BGEPA against RFRA.

[4] Defendant raised RFRA in his motion to suppress in the district court. The district court, however, concluded that the Supreme Court had declared RFRA unconstitutional in <u>Flores,</u> 521 U.S. at 507. <u>See</u> <u>supra</u>, n.1.

1112 (7th Cir. 1994) (Posner, J., concurring) ("In a criminal case we can notice a plain error even if it is not argued to us."). Clearly, Defendant's substantial rights are affected if his conviction under the BGEPA cannot stand because the BGEPA fails RFRA's strict scrutiny analysis. Therefore, at the very least, we have authority to review the issue for plain error.

Because the BGEPA substantially burdens Defendant's free exercise of religion, under RFRA, it must be the least restrictive means of furthering a compelling government interest. 42 U.S.C. § 2000bb-1(b). Whether the BGEPA is the least restrictive means to further a compelling government interest is a factual question that depends on several factual determinations that the record does not resolve. Such factual determinations include the effect of the recent reclassification of bald eagles from endangered to threatened, see Final Rule to Reclassify the Bald Eagle from Endangered to Threatened in All of the Lower 48 States, 60 Fed. Reg. 36000 (July 12, 1995); see also 50 C.F.R. pt. 17; Proposed Rule to Remove the Bald Eagle in the Lower 48 States from the List of Endangered and Threatened Wildlife, 64 Fed. Reg. 36454 (July 6, 1999), and the number of non-Indian adherents to Native American religions who want eagle feathers for religious purposes. See Gibson v. Babbitt, 223 F.3d 1256, 1258 (11th Cir. 2000) (noting that the record "indicates that the demand for eagle parts exceed[s] the supply . . . [and] there is a sizeable pool of [non-Indian adherents to the Native American religion]"). Without a fully developed record, we cannot conduct the close scrutiny required when

evaluating whether the government's interest is so compelling as to overbalance the individual interest in the free exercise of religion. See Sherbert, 374 U.S. at 406 ("[O]nly the gravest abuses, endangering paramount interest justifies the substantial infringement of First Amendment free exercise rights."). Accordingly, I would remand for further fact finding regarding whether the BGEPA is the least restrictive means of furthering a compelling government interest. See Peyote Way Church of God, Inc. v. Thornburgh, 922 F.2d 1210, 1213 (5th Cir. 1991) (remanding for further consideration of Peyote Way's claim that federal and state laws prohibiting peyote possession infringe its members' right to freely exercise their religion.).[5] I dissent.

---

[5] In addition to his Free Exercise claim, Defendant also argues the BGEPA violates the Establishment Clause of the First Amendment. According to Defendant, the BGEPA creates impermissible denominational preference for Native American religion as practiced by members of federally recognized Indian tribes. The Court concludes that the BGEPA does not violate Defendant's Establishment Clause rights. I believe, however, that discussion of the issue is unnecessary. We need not now decide Defendant's Establishment Clause challenge to the BGEPA because the BGEPA must survive RFRA's strict scrutiny under Defendant's Free Exercise Clause challenge. If the BGEPA survives RFRA's strict scrutiny, it will pass any level of scrutiny applicable to Establishment Clause challenges. Further, if the BGEPA fails RFRA's strict scrutiny, Defendant's conviction cannot stand and Defendant's Establishment Clause challenge becomes moot.